## NEW YORK OYER AND TERMINER.

MARCH, 1845.

Before EDMONDS, Circuit Judge, and two Aldermen.

### THE PEOPLE v. ANDREW KLEIM.

The mode of trying the question of present insanity, when interposed as an objection to the prisoner's being put upon his trial for the principal offense charged.

The form of the oath administered to the jurors.

On that inquiry the prisoner holds the affirmative of the issue.

The form of the question to be put to medical witnesses as experts.

In order to constitute insanity a defense in a criminal accusation, it must be proved that at the time of committing the act, the prisoner was laboring under such a defect of reason from disease of the mind as not to know the nature and quality of the act he was doing, or if he did know, that he did not know he was doing what was wrong; and the question whether he knew the difference between right and wrong is not to be put generally, but in reference to the very act with which he was charged.

THE prisoner was arraigned on an indictment charging him with the willful murder of Catharine Hanlin, on the 23d December, 1844. On being called upon to plead, his appearance and deportment were such as to excite doubts in the mind of the court as to his sanity. In reply to questions from the circuit judge, the prisoner stated he had been sixteen years in this country; that he had no relatives or friends here; that he did not know why he was brought into court, and that he had no counsel to speak for him, and did not wish any.

The Court thereupon assigned A. BENEDICT, L. B. SHEP-HERD and E. J. PORTER, counsel to defend the prisoner.

*The Counsel for the Prisoner*, after consultation, objected to the prisoner being called on to plead, or submit to a trial, on the ground of his present insanity (2 R. S. 698, § 2), and moved that inquiry should be made into that fact, in such manner as the court might direct. It was insisted by them that the question of present insanity might be raised by the court upon inspection of the prisoner, as in the cases of *The Commonwealth* v. *Hathaway*, 13 Mass. R. 299, and *The same* v. *Bailey*, 1 Id. 103, or by the counsel for the prisoner; and that the question might be determined by the court with the aid of a medical commission, as was done in France in the case of *Henriette Cornier*, and other cases, or impanel a jury for the purpose. That the latter was the common law practice as laid down in 1 Hale's P. C. 34, 35, which was followed in the case of *Hathaway, cited above*, and approved in Barbour's Cr. Law, 300, and that the statute being in affirmance of the common law, and designating no method of procedure, the common law mode must be that intended to be pursued.

*The District Attorney, contra*, contended that the proper course would be that the prisoner's plea should be recorded, and a jury impaneled to inquire into the question of present insanity, and try the issue on the indictment at the same time.

*The Circuit Judge:* The statute on this subject merely says that an insane person shall not be tried, but is entirely silent as to the manner in which the insanity is to be ascertained. That is therefore necessarily left to the discretion of the court in which the suggestion of insanity shall be made.

In some instances this has been inquired into by the same jury who try the main question of guilt or innocence, and at the same time. But this was objectionable because it mingled together questions which ought to be kept distinct, and he had witnessed a recent case of the kind in the Second Circuit in

The People v. Andrew Kleim.

which the learned judge of that circuit had expressed his regret that the suggestion of present insanity had been made at so late a stage of the trial as to compel this course.

The inquiry might doubtless also be made by the aid of a quasi commission, in the nature of one *de lunatico inquirendo*, and thus, as had been suggested by the prisoner's counsel, the aid of experts might be invoked by the court.

But the court held it proper to adhere to the common law mode of trial, and therefore directed a jury to be impaneled to try the issue of present insanity.

APRIL, 1846.

The prisoner was again brought into court, and a jury sworn " diligently to inquire, and a true verdict return on behalf of "the People of the State of New York, whether Andrew "Kleim, the prisoner at the bar, who now stands indicted for "murder, be of sound mind and understanding, or not, and a "true verdict give according to the best of their understand- "ing."*

*Benedict*, for the prisoner, claimed to hold the affirmative.

*Per Curiam:* That is right. You are to make out affirmatively that the prisoner is now insane.

Several witnesses were then examined in relation to the condition of his mind.

*The Prisoner's Counsel* contended that a state of mind which would warrant a commission *de lunatico* out of chancery, would be sufficient to justify a verdict for the prisoner on the present issue.

*The District Attorney* insisted that such a verdict would be warranted only by a state of insanity which would exempt him from legal responsibility.

---

* Vide *Barb. Cr. Treat.* 300; 1 *Mass. R.* 102; 13 *Mass. R.* 299; 1 *Hale's P. C.* 35; 1 *Collinson on Lunatics*, 499; Frith's Case, 22 *How. St. Tr.* 311.

*The Circuit Judge* charged the jury that there were two degrees of mental disease known to or recognized by our laws. One described as "idiots, lunatics, persons of unsound mind," and the other as "insane persons," either of which would warrant the Court of Chancery to interfere, by appointing a committee to take care of the estate of the person so afflicted, because his mind was so diseased or infirm as to render him incapable of managing his affairs. And as the question in this case seemed to be whether the prisoner was now in such a condition of sanity as to permit him to prepare for and manage his defense on the charge in the indictment, it might be supposed that it would be enough for him, on this inquiry, to establish the lesser degree of unsoundness, namely, that which went so far only as to render him incapable of managing his affairs. But the statute had established a different rule, and had, in reference to this inquiry, required the higher degree of unsoundness of mind, that which the law allowed to exempt from legal responsibility.

The provision of the statute (2 R. S. 697, § 2), was that no act done by a person in a state of insanity can be punished as an offense; and no insane person can be tried or sentenced to any punishment, or be punished for any crime or offense, while he continues in that state.

In order, therefore, for the jury to be warranted in finding the affirmative of the issue now presented, they must be satisfied that the prisoner's mind was now in such a state of unsoundness or disease as to exempt him from responsibility; and not merely that it was so infirm as to render him incapable of managing his own affairs.

The jury found that the prisoner was not now insane.

MAY 21, 1845.

The prisoner was now arraigned on the main issue, and by his counsel pleaded *not guilty*.

The indictment charged the prisoner with the willful murder of Catharine Hanlin, at the city of New York, on the 23d of December, 1844, by setting fire to the dwelling in which she

resided, and forcibly detaining her therein; also, inflicting on her wounds by a sharp instrument; by means whereof she was so suffocated and injured as to cause her death.

*The District Attorney* offered in evidence a deposition of the deceased, taken and sworn to on the 22d December, 1844, before the committing magistrate, and which deposition was again sworn to by her before the coroner on the following day, in the presence of the prisoner and his counsel, having been previously read over to her by the coroner. It was proved that she was dangerously ill at the time, and in imminent peril of death; that upon being asked by the coroner if she considered herself in a dying situation, she answered several times she "hoped to God she might get well," and that she "hoped God would have mercy on her." She was then in the hospital, where she remained until her death, which took place on the third day following. .

*The Prisoner's Counsel* objected to the deposition being received in evidence as a declaration made *in extremis*, contending it had not been shown that the deceased was fully conscious of her hopeless situation; and that her declaration had not been made under such a realizing sense of impending death as was essential to impart to it the sanctity of an oath.

*The Court* was of opinion that the consciousness of her actual situation was sufficiently apparent, and therefore overruled the objection and admitted the evidence.

It was proved on behalf of the prosecution that the deceased, with her husband and children, resided in a wooden shanty or dwelling, the only door of which was in the front, and that it was distant about five yards from the prisoner's residence. On the 21st of December the prisoner had thrown stones at the deceased, who expressed an intention of taking out a warrant against him. On the morning of the following day, between six and seven o'clock, the prisoner came out of his

house and piled wood-shavings and straw at the door of the deceased's residence, to which he then set fire. The deceased attempted to escape through the door, but was forcibly thrust back by the prisoner, who stabbed her in the thigh with a sharp instrument attached to a stick. She went to the window with her son, a boy of about thirteen years of age, when the prisoner threatened to cut her throat; she then swooned away and became senseless. The prisoner retired to his own house, and the neighbors, to rescue the inmates of the shanty, broke open a window and took out the boy and an infant unhurt. They found the deceased lying insensible on a bed. The prisoner fastened his own house, which was shortly afterward broken open by the officers who arrested him.

The defense was insanity, and several witnesses testified to the general deportment, and to particular acts of the prisoner for a long time prior and down to the time of the commission of the offense, for the purpose of proving his insanity at that time, and for a considerable period previous thereto.

The following medical witnesses were then examined on behalf of the prisoner:

Dr. Tellkampff testified that he had given a good deal of attention to cases of insanity; he had seen the prisoner several times since his arrest, and at each interview had conversed with him both in the German and English languages. From this investigation witness concluded he had been suffering from monomania or melancholia, and that he was insane; he appeared quite insensible as to the fate that awaited him, and did not seem conscious of the offense he had committed. The witness had heard the previous testimony on the trial. He did not consider the prisoner to have been imbecile from birth.

Dr. Pliny Earle, superintendent of the Bloomingdale lunatic asylum: Had been specially engaged in the treatment of insane persons for more than three years. At the request of the circuit judge the witness visited the prisoner several times since his arrest. He had heard the previous evidence on the trial.

The People v. Andrew Kleim.

The witness was then asked by prisoner's counsel—if, from the evidence of the witnesses he had heard testify, as well as from his own experience and observation, he was of opinion that the prisoner was insane.

*The District Attorney* objected, and

*The Circuit Judge* decided that the question, if admissible at all, could not be put until after all the testimony relative to the question of sanity had been given, and even then, not in the form now proposed.

The witness then testified, that from his personal examination of the prisoner, and without regard to any of the testimony given, he believed the prisoner to be insane; that his stolid expression of countenance, and his apparent apathy for, and unconsciousness of his situation, had tended to the formation of witness' opinion.

*The Prisoner's Counsel* then asked: "From the testimony you have heard in this case, in relation to the conduct and previous life of the prisoner, what is your opinion of the state of his mind at the time of the commission of the act for which he stands charged?"

*The District Attorney* objected that the question was based on the assumption of the truth of the facts, and involved an expression of the witness' opinion as to their truth, which was a point to be decided by the jury.

*The Court* disallowed the question, observing that it sought to substitute the opinion of the witness for the decision of the jury; that the question should not be limited or confined to any particular period, for by so doing the medical witnesses would be made to usurp the province of the jury. It was true that the issue to be tried was the prisoner's state of mind at the time of committing the offense, but that point was to be determined by the jury.

On cross-examination of the witness, *The District Attorney*, after stating several of the facts relating to the prisoner's conduct, which had been proved, asked if such facts would affect or alter the witness' opinion as to his sanity.

*The Prisoner's Counsel* objected that the case put by the question did not include all the facts which had been proved, all of which should be included as the basis of the opinion of the witness.

*The Court* agreed with the prisoner's counsel that, in view of the main question, the proper course was to ask the opinion of the witness on all the facts given in evidence, as the selection of particular parts, or classes of actions, as the foundation of opinions, would lead to great prolixity, and tend to no satisfactory result. Viewing it, however, as a means of testing the accuracy of the witness' observation, and the value of his opinion, the question was relevant and must be allowed.

On re-examination, the witness was asked "whether the conviction he had formed from his own examination of the prisoner had been confirmed by the testimony he had heard in court?" which question was objected to.

The court overruled the question as involving an expression of opinion as to the truth of the facts testified to.

Dr. J. H. Schmidt testified that he had examined the prisoner with regard to his state of mind, and that from his observation, and the general appearance of the prisoner, he thought him to be insane. He was of opinion that the prisoner was laboring under the mental disease termed *dementia*, which included imbecility, monomania, and, according to some writers, though not in the opinion of the witness, idiocy.

*The District Attorney* pressed the witness to state what division of *dementia*, as defined above, the prisoner was laboring under, but —

The People v. Andrew Kleim.

*The Court* restrained further inquiry upon this point, the circuit judge observing that the witness had already stated the distinguishing features of the generic term *dementia;* that it would be useless to pursue the subject through all the divisions and classifications of writers on the subject, as, when he should charge the jury, he should instruct them that the question for their determination was the prisoner's capacity to distinguish between right and wrong; whether he was laboring under such alienation of mind, dementia, monomania, or whatever else it might be called, as amounted, in their judgment, to such a deprivation of reason as to exempt him from legal responsibility for crime; and that in forming their conclusion they were not to be governed by the refinements or distinctions found in the books on insanity, and introduced into those treatises, merely as helps to an orderly and logical mode of treating the subject.

*The Prisoner's Counsel* here rested, and the district attorney called witnesses to rebut the defense. The police officer who conveyed the prisoner to gaol was asked, "If at the time of the prisoner's arrest, and during his way to prison, the witness saw any fact, or observed any action which he thought so incoherent as to make him believe the prisoner was disordered in his mind?"

This was objected to as involving an expression of opinion upon the facts or actions.

*The Court* allowed the question, on the ground that it was only asking if the witness had observed any thing strange or unusual. Regarding the facts, it was a proper question, and it was difficult to separate the opinion from the fact.

*The District Attorney* asked of one of the medical witnesses called for the prosecution "whether, if the prisoner had committed homicide, he had, in the opinion of witness, sufficient capacity to know he was violating the moral law?"

*The Court* overruled the question, inasmuch as that was precisely the issue which was submitted to the jury, and it would be usurping their province to allow it to be put to the witness.

*The Circuit Judge*, during the progress of the examination of the medical witnesses, said that the court, yielding to the authority of the case of *Abner Rogers* (Sup. Ct. of Mass.), in which the same defense was set up, would adopt the form of question there allowed, which was: "Assuming the facts to be true which you have heard testified to, what is your opinion as to the prisoner's sanity, or otherwise?" and would confine the counsel for the defense to that form of question.

*The District Attorney* then offered to prove by the records of the court, the proceedings on the inquiry as to the prisoner's sanity at the time of his being first arraigned on this indictment, and which are above set forth. He contended that the verdict on that inquiry was competent evidence to go before the jury on the present issue.

*The Prisoner's Counsel* objected.

*The Court:* It does not appear from the case cited by the prosecuting counsel whether the proof was admitted after objection, or introduced by consent. To admit the verdict on the previous inquiry evidence would involve the necessity of going into the testimony on which it was predicated; and thus cause the present jury to sit in review of that verdict while trying the issue now presented to them. The evidence is therefore inadmissible.

*The Circuit Judge* charged the jury as follows:
He told them that there seemed to be no doubt that Kleim had been guilty of the killing imputed to him, and that, under circumstances of atrocity and deliberation, which were calculated to excite in their minds strong feelings of indignation

The People v. Andrew Kleim.

against him. But they must beware how they permitted such feelings to influence their judgment. They must bear in mind that the object of punishment was not vengeance, but reformation; not to extort from man an atonement for the life which he cannot give, but by the terror of the example to deter others from the like offenses; and that nothing was so likely to destroy the public confidence in the administration of criminal justice as the infliction of its pains upon one whom Heaven had already afflicted with the awful malady of insanity.

It was true that insanity was sometimes feigned, but in the present advanced stage of the knowledge of the disease, it was almost, if not quite, impossible that such simulation could escape detection and exposure when subjected to a careful and skillful examination. So it was true that the plea of insanity was sometimes adopted as a cloak for crime, and a shield against the consequences of its perpetration, and cases had occurred — that of Amelia Norman, and a recent occurrence at Philadelphia, were familiar instances — where popular feeling ran so strong in favor of the criminal on trial as to induce juries to seize with avidity upon this as an excuse for indulging their predilections for the prisoners. These things had worked in the public mind a prejudice against the defense of insanity, and had produced in courts and juries a disposition to receive it with extreme jealousy, and scrutinize it with praiseworthy caution. Yet, under all these disadvantages, it was, unfortunately, equally true that many more persons were unjustly convicted, and caused to suffer the punishment for crime, to whom their unquestioned insanity ought to have been an unfailing protection.

After mentioning two or three cases of the kind, of a remarkable character, he alluded to the examination he had then lately made among the insane convicts at the State prison at Sing Sing, where he found that, of thirty such persons, twenty-two were, beyond all question, in a state of mental aberration at the time of their committal. He told the jury that he referred to these matters in order to impress upon

their minds the necessity of calm deliberation, with an entire freedom from prejudice.

He instructed them, also, that it was by no means an easy matter to discover or define the line of demarkation where sanity ended and insanity began, and it very frequently occurred that a condition of mental aberration shaded off from a sound state of mind so gradually and imperceptibly that it was difficult for those most "expert" in the disease to detect or explain its beginning, extent or duration. And in this, as in other diseases of the human system, there was an infinite variety, so great, indeed, as almost to justify the remark that no two cases were ever precisely alike. Hence it was necessary for him to remark to the jury, in regard to the different kinds of insanity which writers on the subject had described, and to which their attention had been so earnestly directed by the prosecution, that it would be proper for them to pay attention to such classifications only so far as to enable them to understand the positions of these writers; that those classifications were, in a great measure, arbitrary, and had been adopted mainly for the purpose of obtaining a clear and lucid manner of treating the subject; and the jury were not obliged to bring the case of the prisoner within any one of the classes or kinds of insanity thus defined, in order to acquit him of legal responsibility, for it was a well established fact that the diagnostics of the different kinds were continually running into, and mingling with, each other.

So, too, it was important that the jury should be made precisely to understand how much weight was to be given to the opinions of medical witnesses. The discoveries in the nature of the disease, and the improvements in the mode of its treatment, had been so great in modern times that it had become almost a distinct department of medical science, to which some practitioners devoted themselves exclusively. The opinions of such persons, especially when to their knowledge they added the experience of personal care of the insane, could never be disregarded with safety by courts and juries. And, on the other hand, the opinions of physicians who had not

devoted their particular attention to the disease, were not of any more value than the opinions of persons in other callings, nor, indeed, of so much value as the opinions of many not educated to the profession, but who had been so situated as to have given particular attention to the disease, and to patients suffering under it.

There were two kinds of unsoundness of mind recognized in the statutes. One described as "lunatics, persons of unsound mind and incapable of conducting their own affairs," and the other comprehended under the general appellation of "insane persons." It is with the latter class only that we have to do in the administration of criminal justice, and the inquiry for the jury, therefore, was whether the prisoner was an "insane person." What is meant by an "insane person" is now, and long has been, a matter of great difficulty. At one time it was held by courts to be only such an overthrow of the intellect that the afflicted person must "know no more than the brutes," to be exempt from responsibility. At another time, he must be "unable to count twenty." As science and the knowledge of the disease progressed, it was found that very many were excluded by this very contracted rule from the protection to which they were justly entitled, and the rule has been extended in modern times until it begins to comprehend within its saving influences most of those who by the visitation of disease are deprived of the power of self-government. Yet the law, in its slow and cautious progress, still lags far behind the advance of true knowledge.

The inquiry to be made under the rule of law as now established, was as to the prisoner's knowledge of right and wrong at the time of committing the offense. Every man is to be presumed sane, and to possess a sufficient degree of reason to be responsible for his crimes until the contrary be proved to the satisfaction of the jury; and to establish a defense on the ground of insanity, it must be clearly proved that at the time of committing the act, the party accused was laboring under such a defect of reason, from disease of the mind, as not to know the nature and quality of the act he was doing,

or, if he did know it, that he did not know he was doing what was wrong. And the question whether the accused knew the difference between right and wrong is not to be put generally, but in reference to the very act with which he is charged, and the inquiry, therefore, is, had the accused a sufficient degree of reason to know that he was doing an act that was wrong, or was he laboring under that species of mental aberration which satisfies the jury that he was quite unaware of the nature, character and consequences of the act he was committing.

If some controlling disease was in truth the acting power within him, which he could not resist, or if he had not a sufficient use of his reason to control the passions which prompted the act complained of, he is not responsible; but we must be sure not to be misled by a mere impulse of passion, an idle, frantic humor, or unaccountable mode of action, but inquire whether it is an absolute dispossession of the free and natural agency of the human mind. In the language of ERSKINE, "It is not necessary that Reason should be hurled from her seat; it is enough that Distraction sits down beside her, holds her trembling in her place, and frightens her from her propriety."

And it must be borne in mind that the moral, as well as the intellectual faculties, may be so disordered by the disease as to deprive the mind of its controlling and directing power.

In order, then, to constitute a crime, a man must have memory and intelligence to know that the act he is about to commit is wrong; to remember and understand that if he commits the act he will be subject to punishment; and reason and will to enable him to compare and choose between the supposed advantage or gratification to be obtained by the criminal act, and the immunity from punishment which he will secure by abstaining from it. If, on the other hand, he have not intelligence and capacity enough to have a criminal intent and purpose, and if his moral or intellectual powers are so deficient that he has not sufficient will, conscience, or controlling mental power, or if, through the overwhelming violence of mental disease, his intellectual power is for the time obliter-

The People v. Andrew Kleim.

ated, he is not a responsible moral agent, and is not punishable for criminal acts.

Guided by these rules, the jury were instructed by the court to inquire whether the accused was justly responsible for the act he had committed, and they were to consider, as aids to a just conclusion, the extraordinary and unaccountable alteration in his whole mode of life; the inadequacy between the slightness of the cause and the magnitude of the offense; the recluse and ascetic life which he had led; his invincible repugnance to all intercourse with his fellow creatures; his behavior and conduct at the time the act was done and subsequently during his confinement in prison, and the stolid indifference which he alone had manifested during the whole progress of the trial, upon whose result his life or death was dependent. And they must continually bear in mind that the punishments of the law, and especially its severest penalties, would be shorn of their salutary influence upon the public when inflicted upon one already suffering under one of the most severe and afflicting maladies to which human nature was subject.

The jury returned a verdict of *not guilty*, on the ground of insanity, whereupon the court made the following order:

" The prisoner, having on his trial for murder been acquitted by the verdict of the jury, on the ground of insanity, and the court being certified of the fact, and having also carefully inquired and ascertained that such insanity does still continue,

"It is ordered that the said prisoner be detained in safe custody, and be sent to the State lunatic asylum; that the sheriff of the city and county of New York do forthwith transport the said prisoner to the said asylum; and that the said prisoner be detained and kept in safe custody in the said asylum until thence discharged according to law.

[The prisoner remained a few years in the asylum, and died there, his disease having steadily grown worse until he became a mere driveling idiot.]

## DOCTRINE OF INSANITY.

Note.—The question of exemption from legal responsibility for crime, by reason of unsoundness of mind, has so long been one of the most difficult and perplexing questions that have been presented to courts of justice, that it has been thought that it would not be unacceptable to the profession to state here, and in this connection, the result to which much reflection and some experience have brought the reporter's mind on the subject.

Shortly before my elevation to the bench, and when I was one of the inspectors of the State prison at Sing Sing, I was present at a court in Westchester county, where a man was tried for a rape.

After the jury had retired, I expressed to the presiding judge my opinion that the man was insane. I had never seen, nor heard of him before, but I judged from the testimony in the case, which, as no one knew who the man was, was necessarily confined to the acts connected with the offense. The man was convicted and sent to the State prison.

Within a month the attention of the board of inspectors was called to his case, and he was reported to us by our physician, our chaplain, and principal keeper, as unquestionably insane.

Before treating him as such, however, we caused minute inquiries to be made, and we found that he had been confined in the county lunatic asylum on Blackwell's Island for several years, and was regarded as a confirmed lunatic; that that asylum being inconveniently crowded, its officers had turned loose upon the community some fifteen or twenty of its most harmless inmates, and this man among them; that he had wandered off from the city into the country, and within forty-eight hours of his discharge from that institution had committed this offense. We committed him to the State asylum without any hope that he would ever recover.

As I knew that the judge who tried him was one of the soundest jurists in the State, I at once inquired what was the rule of law that would warrant this conviction?

I found it was this, as charged by that judge: That if he had capacity and reason enough to enable him to distinguish between right and wrong, as to the particular act, he was not exempt from punishment for crime.

Now, this man did know that the act he was doing was wrong; he talked about it as rationally as I could, yet he was unquestionably and incurably insane. He was far too unsound to have it safe for him to go at large, so that no great harm was done in that particular case, for the result was merely to return him to confinement again. But, I asked myself, suppose the punishment had been death, what was there in the law to prevent the horrible tragedy — the judicial murder of hanging an insane man?

Yet I found the rule, as then prevailing in the law, was as the judge had charged it to the jury.

In the case of *Abner Rogers*, Chief Justice Shaw, of Massachusetts, had laid down the rule in this form: "A man is not to be excused from responsibility if he has capacity and reason sufficient to enable him to distinguish between right and wrong as to the particular act he is then doing; a knowledge and consciousness that the act he is doing is wrong and criminal, and will subject him to punishment. In order to be responsible he must have sufficient power of memory to recollect the relation in which he stands to others, and in which others stand to him; that the act he is doing is contrary to the plain dictates of justice and right, injurious to others, and a violation of the dictates of duty. On the contrary, although he may be laboring under partial insanity, if he still understands the nature and character of his act, and its consequences, if he has a knowledge that it is wrong and criminal, and a mental power sufficient to apply that knowledge to his own case, and to know that if he does the act he will do wrong and receive punishment, such partial insanity is not sufficient to exempt him from responsibility for criminal acts. If, then, it is proved to the satisfaction of the jury that the mind of the accused was in a diseased and unsound state, the question will be whether the disease existed to so high a degree, that

for the time being it overwhelmed the reason, conscience and judgment, and whether the prisoner in committing the homicide acted from an irresistible and uncontrolable impulse: if so, then the act was not the act of a voluntary agent, but the involuntary act of the body without the concurrence of a mind directing it."

This rule was quoted in 2 Greenleaf's Evidence, § 372, as the settled law.

In *McNaughton's case* (10 Clark & Fin. 210), the twelve judges of England, in answer to queries by the House of Lords, laid down the rule as the law of Great Britain as follows:

The questions propounded to the learned judges by the House of Lords were in these words:

1. What is the law respecting alleged crimes, committed by persons afflicted with insane delusion in respect of one or more particular subjects or persons; as, for instance, where, at the time of the commission of the alleged crime, the accused knew he was acting contrary to law, but did the act complained of with a view, under the influence of insane delusion, of redressing or avenging some supposed grievance or injury, or of producing some supposed public benefit?

2. What are the proper questions to be submitted to the jury when a person alleged to be afflicted with insane delusion respecting one or more particular subjects or persons, is charged with the commission of a crime (murder, for example), and insanity is set up as a defense?

3. In what terms ought the question to be left to the jury as to the prisoner's state of mind at the time when the act was committed?

4. If a person, under an insane delusion as to existing facts, commits an offense in consequence thereof, is he thereby excused?

5. Can a medical man, conversant with the disease of insanity, who never saw the prisoner previous to the trial, but who was present during the whole trial and the examination of all the witnesses, be asked his opinion as to the state of the

.The People v. Andrew Kleim.

prisoner's mind at the time of the commission of the alleged crime, or his opinion whether the prisoner was conscious, at the time of doing the act, that he was acting contrary to law; or whether he was laboring under any, and what delusion at the time?

The joint opinion of all the judges, except Mr. Justice MAULE, was delivered by Lord Chief Justice TINDAL, as follows:

My Lords, Her Majesty's judges, with the exception of Mr. Justice MAULE, who has stated his opinion to your Lordships, in answering the questions proposed to them by your Lordship's House, think it right, in the first place, to state that they have forborne entering into any particular discussion upon these questions, from the extreme and almost insuperable difficulty of applying those answers to cases in which the facts are not brought judicially before them. The facts of each particular case must of necessity present themselves with endless variety, and with every shade of difference in each case, and it is their duty to declare the law upon each particular case on facts proved before them, and after hearing arguments of counsel thereon. They deem it at once impracticable, and at the same time dangerous to the administration of justice, if it were practicable, to attempt to make minute applications of the principles involved in the answers given them by your Lordships' questions; they have, therefore, confined their answers to the statements of that which they hold to be the law upon the abstract questions proposed by your Lordships; and as they deem it unnecessary in this particular case to deliver their opinions *seriatim*, and as all concur in the same opinion, they desire me to express such their unanimous opinion to your Lordships.

In answer to the first question, assuming that your Lordships' inquiries are confined to those persons who labor under such partial delusions only, and are not in other respects insane, we are of the opinion that, notwithstanding the party accused did the act complained of, with a view, under the influence of insane delusion, of redressing or avenging some

supposed grievance or injury, or producing some public benefit, he is nevertheless punishable, according to the nature of the crime committed, if he knew, at the time of committing such crime, that he was acting contrary to law — by which expression we understand your Lordships to mean the law of the land.

As the third and fourth questions appear to us to be more conveniently answered together, we have to submit our opinion to be, that the jury ought to be told, in all cases, that every man is to be presumed to be sane, and to possess a sufficient degree of reason to be responsible for his crimes, until the contrary be proved to their satisfaction; and that to establish a defense on the ground of insanity, it must be clearly proved that at the time of committing the act the party accused was laboring under such a defect of reason, from disease of the mind, as not to know the nature and quality of the act he was doing; or, if he did know it, that he did not know he was doing what was wrong. The mode of putting the latter part of the question to the jury on these occasions, has generally been, whether the accused, at the time of doing the act, knew the difference between right and wrong; which mode, though rarely if ever leading to any mistake with the jury, is not, as we conceive, so accurate when put generally and in the abstract, as when put with the party's knowledge of right and wrong in respect to the very act with which he is charged. If the question were to be put as to the knowledge of the accused solely and exclusively with reference to the law of the land, it might tend to confound the jury, by inducing them to believe that an actual knowledge of the law of the land was essential in order to lead to a conviction; whereas the law is administered upon the principle that every one must be taken conclusively to know it, without proof that he does know it. If the accused were conscious that the act was one which he ought not to do, and if that act was at the same time contrary to the law of the land, he is punishable, and the usual course, therefore, has been to leave the question to the jury whether the party accused had a sufficient degree of reason to know

that he was doing an act that was wrong; and this course we think is correct, accompanied with such observations and explanations as the circumstances of each particular case may require.

The answer to the fourth question must of course depend on the nature of the delusion; but making the same assumption as we did before, namely, that he labors under such partial delusion only, and is not in other respects insane, we think he must be considered in the same situation, as to responsibility, as if the facts with respect to which the delusion exists were real. For example, if under the influence of delusion he supposes another man to be in the act of attempting to take away his life, and he kills that man, as he supposes, in self-defense, he would be exempt from punishment. If his delusion was, that the deceased had inflicted a serious injury to his character and fortune, and he killed him in revenge for such supposed injury, he would be liable to punishment.

In answer to the last question, we state to your Lordships that we think that the medical man, under the circumstances supposed, cannot in strictness be asked his opinion in the terms above stated, because each of these questions involves the determination of the truth of the facts deposed to, which it is for the jury to decide; and the questions are not mere questions upon a matter of science, in which case such evidence is admissible. But where the facts are admitted, or not disputed, and the question becomes substantially one of science only, it may be convenient to allow the question to be put in that general form, though the same cannot be insisted on as a matter of right."

The first case of insanity that came before me as judge was this case of Kleim. In the preliminary inquiry into present insanity I followed this rule, and the verdict of the jury at once satisfied me that it had misled them, for he was not totally, but only "partially insane," and he did know that it was wrong to shut that woman and her children in their hut and burn them to death; yet there was no doubt of his insanity, and in less than a year he became a mere driveling idiot, and so died.

He knew the act was wrong, yet he was insane. The act of piling up shavings, fastening the woman in her hut, and forcing her back into the flames, was not an "involuntary act of the body without the concurrence of a mind directing it," yet he was insane. He knew the "act was contrary to the plain dictates of justice and right, injurious to others, and a violation of the dictates of duty," yet he was insane. He knew "he was acting contrary to law," yet he was insane. He knew the act was "one he ought not to do," yet he was insane.

So that it seemed to me that though the man was unquestionably insane, he was yet to be hung for murder, and so it seemed that all that class of cases known among scientific men as moral insanity as distinguished from physical, was entirely without the protection of the law.

Hence it was that I made the examination of the rule, and stated the result as contained in my charge. I do not mean to be understood as saying that I have settled the rule. I have but announced an onward step, and it remains for subsequent adjudications to say whether it shall be sustained. In the mean time, I have been assured that the rule as I have stated it is more acceptable than any other yet announced, to those of the medical profession to whom insanity has been a particular study, and the English doctrine has received a very signal condemnation from that class of physicians there.

It appears from the Report of the Capital Punishment Commission, made to Parliament in 1866, that at the annual meeting of the association of medical officers of asylums and hospitals for the insane, held at the Royal College of Physicians July 14, 1864, at which were present fifty-four medical officers, it was unanimously "*Resolved*, that so much of the "legal test of the mental condition of an alleged criminal "lunatic as renders him a responsible agent, because he knows "the difference between right and wrong, is inconsistent with "the fact well known to every member of this meeting; that "the power of distinguishing between right and wrong exists "very frequently among those who are undoubtedly insane,

The People v. Andrew Kleim.

"and is often associated with dangerous and uncontrollable "delusions."

I know of no greater difficulty in the law, than the making of a definition of insanity which shall include all the cases that ought to be included, and leave out those which ought to be left out; and for the simple reason that it is impossible for the most skillful of experts to determine always where insanity begins and sanity ends.

The doctrine as contained in my charge does undoubtedly include many cases where, before that, the punishment designed for the sane was inflicted upon the insane; yet I have never supposed that I had removed all difficulty. I had met that and cognate cases only, leaving out, of course, many others.

I afterward attempted to enlarge, and, as far as I could, make definite the rule. In a discourse delivered before the Academy of Medicine, in New York, a few years ago, I ventured upon this definition, which I insert here merely for the examination of the professions, and in the hope that perhaps I may contribute my mite, at least, to the solution of so difficult and so important a problem.

" A sane man is one —

" 1. Whose senses bear truthful evidence.

" 2. Whose understanding is capable of receiving that evidence.

" 3. Whose reason can draw proper conclusions from the truthful evidence thus received.

" 4. Whose will can guide the thought thus obtained.

" 5. Whose moral sense can tell the right and wrong of any act growing out of that thought.

" 6. And whose act can, at his own pleasure, be in conformity with the action of all these qualities.

" All these things unite to make sanity.

" The absence of any one of them makes insanity."