*58 Before impanneling tile jury, Graham cited People v. Dewick (2 Park. Cr., 230), and suggested that the triers be selected by the counsel, which the court so ordered, it being agreed to by the district-attorney.
Graham further cited on questions of bias which subsequently arose on challenges interposed," People v. Freeman (4 Denio, 9); People v. Mather (4 Wend., 229); Trials Per Pais, passim.
Garvin relied on People v. Cancemi (16 N. Y., 502).
A juror having been challenged for principal cause for the prisoner, and that challenge being withdrawn, the People challenged for principal cause, and then withdrew that challenge, and challenged to the favor.
Graham objected to this, insisting that the prisoner has the first right to challenge, and cited Rex v. Brandreth (32 How. St. Tr., 774).
The Court ruled that the point was well taken, and that the prisoner was entitled to the first option of challenging.
Gamin then opened the case for the People to the jury, and called several witnesses, who swore substantially that shortly after 5 p. m. on November 25, 1869, the prisoner entered the Tribune office, went behind the counter; that the deceased came in front of the counter; that an explosion as of a pistol took place; that the deceased was carried wounded up • stairs to one of the editorial rooms of the Tribune, and subsequently to the Astor House.
Gamin then offered to show that the officer who subsequently had the defendant in custody, took the prisoner jthere and confronted him with the deceased before his death,"and that the latter identified him as the man who shot him.
Graham objected ;—1. The prisoner was under du- ■' ress, and the act of the officer was illegal. 2. The dec-, laration of the deceased was not admissible, it not being 'proven that he was in extremis at the time (People v. McMahon, 15 N. Y., 384; People v. Robinson, 2 Park. Cr., 235; People v. Williams, 3 Id., 84; People *59 v. Anderson, 2 Wheel. Cr. Cas., 390; People v. Greene, 1 Park. Cr., 11; People v. Knickerbocker, Id., 302).
The CimAoverruled the objection, and admitted the evidence.
A medical witness, who had been called in to attend the deceased, and who had examined him at the Astor House, was then asked by the district-attorney, “Was that wound necessarily fatal?”
Graham objected that the evidence was inadmissible (Wendell v. Mayor of Troy, 39 Barb., 329; Wilson v. People, 4 Park. Cr., 619; Kennedy v. People, 39 N. Y., 245; S. C., 5 Abb. Pr., N. S., 147).
The Qourt allowed the question, and the witness answered it substantially in the affirmative.
On cross-examination of this witness, Graham asked if he was present at a marriage ceremony performed at the Astor House, after the shooting and before the death of the deceased. The district-attorney objecting, Qraham offered to show that after' the wounding the deceased was subjected to a violent rmental ¡excitement produced by a marriage ceremony performed against the wishes of a physician, which hastened his end, and that that excitement contributed directly to the death of the deceased (3 Greenl. on Ev., § 133).
The Court excluded the question.
The People rested the case.
Graham then moved for an acquittal upon the ground that the corpus delicti was not proven, in that the death charged in the indictment was not definitely shown to have directly resulted from the injury alleged to have been inflicted upon the deceased by the prisoner.
The Qourt denied the motion.
The case was then opened for the defense, and forty - • one lay witnesses and three medical experts were examined for the defense, who substantially testified to the facts embodied in the hypothetical question put subsequently to such medical experts. °
Dr. Reuben A. Vance, testified in substance that he had made three several examinations of xthe prisoner *60 since the Indictment; that the latter was, and had been for some time, suffering from congestion of the brain ; that this fact was confirmed by examinations made of the eye of the prisoner with an opthalmoscope; that witness had been in court and heard all the evidence. The following questions were then put to him by Gerry, to' which he returned the following answers :
Q. Taking into consideration the défendant’s temperament and age, and the belief that his wife had been persuaded to go on to the stage as a first step towards throwing off her allegiance to him ; the belief that his his wife had yielded to the persuasions with that view ; the belief that his wife had absconded from him under the persuasion of the"deceased and others in his'interest, with the understanding that the deceased was to maintain her and keep possession of his children, and prevent his recovering possession of them, assist her in procuring her divorce in another State, and finally marry her ; the belief that his wife and deceased were determined not only to annul his marital relations, but, through their subsequent marriage, to annihilate his parental relations also, by making the deceased the stepfather of his children, both or one of them; the belief that his wife became a piarty to this programme from the start, owing to the influence of parties countenancing her in it, as though disinterested, when they were really in the service of the deceased,"and helping out his intentions to divorce the defendant from his wife and eventually marry her ; the belief that until he recovered his son Percy he would be deprived of both his children ; and after the recovery of Percy, the apprehension that he would forever lose his youngest boy ; the belief that his wife still had an affectiorT for him, and notwithstanding she had left him, would have returned to him but for the pretention of the deceased and the pecuniary countenance and support she received from the deceased ; the belief that after the recovery of his son Percy the deceased had men watching him (the prisoner); the belief that he would lose his son Percy again if he was not con *61 stantly employed, when his health did not justify it; his inability to -write, as shown by erasures and blots ; t-heibelief that his poverty made him^po werless in defeating the determination ofthe'deceasea to appropriate his wife and children ; taking' into consideration, further, his intense fondness for his wife, continually recurring to the endearments that had once passed between them, and the supposed reciprocation of his attachment to her ; his fondness for his youngest son, and his increasing desire to have possession of that son, even though his wife should never again return to him *, the feeling of mortification he must have felt at the deceased supplanting him-in the affections of his wife; the suspicion that he had been dishonored by the adultery of his wife with the deceased before and after she left him; the intercepted letter of the deceased to his wife of March 9, 1867 ; the letter of Mrs. Sinclair of February 21, 1867, and of Mrs. Calhoun of February 22, 1867, written to his wife ; the letters of Mrs. Calhoun to his wife of June 24, 1866, August 26, 1866, and' September 1, 1866, relative to Her taking up the profession of the-stage ; the letter of Mrs. Calhoun, of February (without: day of month or year); the opportunity of frequent’ reference by defendant to these letters, and the feelings and morbidity likely to be thus produced in his mind ; his hallucination that the deceased and his wife were locked in each other’s arms ; the frequent reference to the amount he had to spend in recovering his son Percy, and the poverty he had been left in by it; his wild idea that if he had thirty thousand dollars he could upheave the world ; his repeated conversations with his personal friends on the subject of his domestic troubles, (this being the absorbing topic in his mind), which he invariably entered into when opportunity offered ; his inability to sleep ; his taking remedies to procure sleep ; his loss of appetite ; his want of such a home as he had had with his wife and two children with him; his loss of their society or company ; his dwelling upon suicide ; the unhappiness and valuelessness of his own life; his ’ *62 dreams reproducing his troubles, causing him to start from his bed, as if he' had, or as though to seize, the deceased by the throat; the voice of his absent child crying to him in his sleep ; the belief that he saw strange figures about and ' near him; his trying to fatigue himself, by long walks at unreasonable hours of the night, into a desire to sleep; his statement as to hearing and seeing balls of fire and flashes of light before his eyes ; the involuntary working of the muscles of his chin and about his mouth and nose when in a great apparent mental excitement; the pupils of his eye being at times unusually contracted ; the wild expressions of his eye when he alluded to~his domestic troubles, and frequently when 'he did not; his incoherence of- language and misuse of words ; his inability to converse in a rational way, leaving the subject he was talking upon, and going to something else different from it; his introducing his griefs to comparative strangers ; his talking to his fingers and muttering to himself ; the loss at times of his personal identity; his changing from a pleasant, agreeable literary companion into one tolerated from pity and tenderness on the part of his friends ; his desiring people to be with him or to look- after him lest he should commit suicide ; the unsteadiness of his hand so as almost to prevent the feeling of his pulse ; the nervous motion of his hands when engaged in conversation; the suffused face frequently changing into paleness, and then again into redness ; his tendency to press his head with his hands and to pull his hair, and his complaints of pain in the head--“that his brain was on fire the unnatural distension and starting of his eye (as testified to by William Marsh); his neglect of his person; the difficulty of pleasing him in what he ordered for his meals ; the impossibility of his being calmed by his friends, though spoken to in the most earnest manner by them ; his pulse varying from one hundred to one hundred and twenty per minute, when the normal pulse should be from sixty-five to seventy-five ; his strong personal *63 physical resemblance to a first cousin who died from constitutionally active insanity, no other cause having been proved for it except that occasioned by loss of his property; the duration of these troubles in the prisoner from February 21, 1867, to November 25, 1869, his mind having been proved to be running on his troubles to within some thirty minutes’ time of the alleged shooting—being then shown to have been (if the witnesses are believed) in a state of frenzy or absolute distraction in reference to the conduct of the deceased towards him, and the supposed sale of his property in New Jersey by the deceased, and his removal to some distant place with his youngest son—and then the sudden, unexpected appearance of the deceased. Talc-' ing all these matters into consideration, what, in your judgment, as an expert in diseases of the mind and brain—coupling with all this your knowledge of the prisoner, based upon actual, careful examination and inspection of him since November 25, 1869—what was the condition of his mind on and throughout November 25, 1869, and particularly at the time of the alleged shooting of the deceased ?
A. I should unhesitatingly say that he was not in his right mind ; that he was insane.
Q. Was he or not insane on that particular day, and at that particular point of time ?
A. I should say ‘‘Yes.”
Q. Under all the circumstances just supposed, and to which your attention has been directed, was the prisoner at the bar, in your judgment, and according to your belief, sane or insane on the day and at the point of time in question ?
A. I should say he was insane.
Q. Under the same circumstances, was the prisoner at the bar, in your judgment and according to your belief, at the time of the alleged shooting of the deceased, on November 25, 1869, “ aware of the nature, character, and consequences of the act he was doing?” (Oxford's Case, 9 Carr. & P., 525, 546).
*64 A. I do not "believe he was.
Q. Under the same circumstances, was the prisoner ■ at the "bar, in your judgment and according to your belief, at the time of the alleged shooting of the deceased, on November 25, 1869, “in such a state of mind as to know that the deed was unlawful and morally wrong ?” (Willis v. People, 32 N. Y., 719, per Denio, C. J.).
A. I think not.
Q. Under the same circumstances, was the prisoner at the bar, in your judgment and according to your belief, at the time bf the alleged shooting of the deceased, on November 25,1869, “in consequence of the infirmity of disease, incapable of distinguishing between good and evil, and of forming a judgment upon the consequences of the act which he whs then about to commit?” (Hadfield's Case, 27 How. St. T., 1,286).
A. Yes; lie was incapable, certainly.
■ Hr. Austin Flint having testified that upon examination of the prisoner1 s heart he had detected no organic disease, Hrs. W. A. Hammond and Ralph L. Parsons were examined and gave their evidence as experts as to the nature and causes of insanity, and then answered the hypothetical question substantially in the same terms as Dr. Vance.
Upon cross-examination of Dr. Hammond, Davis, on the witness stating a certain medical book was an authority, offered to read it to contradict the witness.
Graham objected that the evidence was inadmissible ; citing Collier v. Simpson (5 Carr. & P., 73).
The Court so held.
The defense then rested, and the prosecution in rebuttal called Horace Greeley, who was asked by Garvin, “did he (the prisoner) tell you anything about the first' shooting ?”
.Graham objected:—I. The rule is well settled that in rebuttal the People are restricted to evidence controverting the facts proven by the evidence of the defense ; and that no evidence confirmatory of the original case can be introduced by way of rebuttal, even though it *65 clearly establishes the prisoner’s guilt (McLeod’s Trial, pamph., p. 222; Rex v. Hilditch, 5 Carr. & P., 299; Rex v. Stimson, 2 Id., 415; Brown v. Giles, 1 Id., 118; 2 Phil. on Ev., note, 500).
II. The cases seemingly contra (Voke's Case, Russ. & Ry., 531; Roscoe's Crim. Ev. [6 Am. ed.], 88), have been overruled by later cases, and the recent rule'now well settled is, where two offenses of a different grade of felony have been committed by a prisoner who stands charged only with the commission of the latter and •greater, the evidence must be restricted to proof of the last offense. Proof of any one crime cannot be introduced to support the charge of another (Regina v. Oddy, 2 Den. Cr. Cas., 268-73; Barton v. State, 18 Ohio, 221; Cole's Case, 5 Grattan [Va.], 696; Call's Case, 21 Pick., 515, 522; Baker v. State, 4 Pike [Ark.], 56; Dunn v. State, 2 Id., 229; Rex v. Whiley, 2 Leach, 983; Labeau v. People, 34 N. Y., 223; Friery v. People, 2 Keyes, 424.
The Court. “I think the question is entirely competent. The question proposed by the district-attorney is, ‘ Did the prisoner tell you anything about the shooting, and if he did, State it V ■ The counsel for the defense objects that this evidence should have been given by the prosecution in chief when the case was opened. It was impossible for the prosecution to foresee what would be the specific character of this defense, z It was not known to the court, and I assume could not properly be known to any but the counsel for the prisoner. It was, therefore, in my view, only incumbent on the prosecution to establish the mere circumstances of the killing—the bare facts which support the indictment. The law regards all men as sane, and the plea of insanity is interposed by the defense. To sustain it, evidence is adduced by some forty-one witnesses, the greater portion of whom have been called to testify to the acts, conversations, manner, and appearance of this prisoner, more particularly for the last three or four years. If it be competent on the part of the defense to show this man’s insanity *66 "by all these witnesses, is it not fair, is it not just that the prosecution should be permitted to give in evidence conversations had with others, which, in the.opinion of the prosecution, would tend'to show that this man’s mind was in a sound condition, and that he was actuated only by a desire for vengeance! I would not permit, at this time, evidence such as is offered now, under an ordinary defense of not guilty ; but, as it is, I think I am entirely justified, and I feel it to be my duty to admit this question, and it is admitted.”
Davis offered in evidence, after proving the handwriting, a letter bearing date January 7, 1867, from the prisoner’s wife to a Mrs. Runkie, and insisted it was admissible to explain one of the letters from Mrs. Runkie to the prisoner’s wife, which the prisoner had found in his wife’s room after she had left him, and which had been already admitted in evidence for the defense.
. Gerry objected that no statement made by the wife was admissible in evidence against the husband in a criminal proceeding.
The Court. “I cannot see on what principle any statement by Mrs. Macfarland can be evidence against her husband. I should be glad to admit the testimony that you offer for the purpose of vindicating this lady, or any other person whom you think unjustly assailed, but the rule is inflexible, and I must obey that rule which forbids either the wife or the husband to be examined for or against the other. This is in the form of. a written declaration of Mrs. Macfarland, and it cannot be admitted. There is a further objection to the admission of this evidence, that it would allow a wife to manufacture evidence for herself by writing letters containing statements which existed solely in her own imagination ; and it would certainly be unfair that the husband should be prejudiced by statements of that kind. The evidence must be excluded.”
A medical witness having been called as an expert, in behalf of the people, Garvin asked, on the witness stating that he had read all the evidence as published *67 iii the -newspapers -with.a view to make up his mind as to the prisoner’s sanity. Q. “What does that reading indicate to you as to this man’s sanity or insanity ?”
Graham objected, that only a hypothetical question could be put, unless the witness had been in court and heard all the evidence (People v. Lake, 12 N. Y., 358; 1 Greenl. on Ev., § 440).
The Court excluded the question.
•A witness (Mrs Sinclair), whose letter to the wife of the prisoner advising her to leave him, which letter the prisoner found after she left him in March, 1867, and which had been admitted as evidence for the defense, stated that before-writing that letter she had received one from the prisoner’s wife.
Earns then asked, “ Were you aware before the receipt of that letter in Washington that Mrs. Macfarland intended to leave her husband?” .
Gerry objected to this as immaterial and irrelevant, and also .that as the evidence for the defense showed that a certain effect had been produced upon the prisoner, by the witness’ letteif the truth or falsity of the contents of the letter was a matter wholly collateral.
The Court. “ It is true that I permitted the defense to show all the circumstances, facts, and conversations, for the purpose of showing that the mind of the defendant was imbued with the belief that a conspiracy against his domestic happiness existed on the part of a number of persons who have been named, and that I permitted that to the fullest extent. Now, it is a part of the defense here that there was a conspiracy, and the facts stated show by their import that what was stated by the counsel for the defense in the opening is true, that various persons combined together for the purpose of alienating the affections of Mrs. Macfarland from her husband. I stated that whether that fact was true or not was perfectly immaterial. But I think it is due to the prosecution to be permitted to show that in point of fact no 'such conspiracy existed. They may say, and do say, that the insanity was really simulated; that *68 Macfarland knew, in point of fact, that no such conspiracy existed, and that he intended to commit murder merely for the purpose of revenge, while his mind was perfectly sane. I think it my duty to admit the question.”
Another witness for the People (Junius Henri Browne) having stated on cross-examination “ that he believed there were errors in the Bible, as well as in anything else,” >
Davis objected to this examination being continued further.
Graham insisted that it was proper to test the credibility of the witness, and cited Stanbro v: Hopkins (28 Barb., 265).
The Court ruled the line of cross-examination competent.
After the examination of other witnesses for the People, the latter- rested, and the defense in reply recalled _a witness_(Nicholson) who stated that the deceased, after the occurrence of November 25, gave him a parcel wrapped up in white flannel, which was heavy, and which the witness judged at the time was a pistol.
Davis objected to the evidence as incompetent.
Graham insisted the evidence was competent, to impeach the credibility of the witnesses in chief for the People (Reynolds v. State, 1 Kelly [Ga.], 222).
The Court excluded further testimony on the subject.
A witness (Fitzhugh Ludlow) was then called by the defense, to contradict the evidence given by the People, to the effect that the prisoner acquiesced in his wife going on the stage.
Davis objected.
Gerry insisted that in capital cases the widest latitude should be given to the evidence for the defense, and "contended that this always had been the rule from the time of Lord Hale (2 Hale P. C., 290; Austin v. *69 State, 14 Ark., 559; Johnson v. State, 14 Ga., 61; Moore v. State, 2 Ohio St., 580, 506).
T7ie Court. “I will allow the evidence in favor of life.”
Dr. Vance was then recalled by the defense, and asked, on his stating that he had been in coart during the entire trial, and heard all the evidence ;—Q. “ Having[ heard that, have you heard anything to induce you to change your previously expressed _ opinion as to the mental condition of the prisoner on November 25, 1869?”
Davis objected as immaterial, and as re-opening the case.
Gerry insisted that the evidence was material to show that the witness, having heard all the rebutting testimony, still maintained his previous opinion in regard to the mental condition of the prisoner.
T7ie Court allowed the question, and the witness replied that he had heard nothing to change his previous opinion.
■ Both sides having rested,
Graham, closing for the prisoner, insisted:—I. The employment of private counsel in this case was improper. (1.) It was unnecessary (1 Rev. Stat., 5 ed., 883, §§ 202, 203; 2 Laws of 1847, 644, § 33; 2 Brown's Forum, 40). (2.) A public prosecution conducted by a public prosecutor, exclusive of private counsel, always concedes rights to the defense irrespective of technical rules of evidence. Private counsel are absorbed and governed by the private interests whom they represent.
II. This is a case of murder, or nothing. A compromise conviction for manslaughter would be a violation by the jury of their oaths (Cole's Case, 7 Abb. Pr. N. S., 321).
III. As to the alleged shooting of March 13, 1867, it is only evidence against the defendant on the trial of the present indictment, on the principle that that shooting and that of November 25, 1869, occurred while the *70 defendant was in a sane state of mind If the jury believe that the act of November 25, 1869, occurred while the defendant was in a state of insanity, it is unaffected by the act of March 13, 1867, even though the act was committed in a state of sanity.
IV. To make the threats evidence of malice for any purpose, theyjvould have_to be uttered while the defendant was in a sane state of mind. To connect them with the shooting of November 25, 1869, the jury must find that they were uttered maliciously, seriously, with the intent to execute them when and as they imported, by the defendant in a state of sanity, and that that shooting occurred in pursuance of these threats. Under any circumstances, the jury must find that the threats and act in question were the result of a sane mind. Upon the point of the seriousness of the threats, the jury are to consider the fact that those to whom they were made neither notified ■ the deceased of them, nor took any steps, to have the defendant arrested for them, in pursuance of law. If the jury believe that the threats were unmeaning, and were uttered in a state of excitement or anger, without any intention of executing them, and wholly as the result of passion, they are not to be regarded in determining the character of the homicide in question. As to the (alleged) shooting of the deceased by the defendant on March 13, .1867, that can not be taken by the jury as evidence of malice, unless the prosecution have satisfied them by proof beyond all peradventure, that that shooting was felonious. To do this, the proof must be such as would induce the jury to find a verdict against the defendant, if he was on trial under an indictment for that act. If the j ury believe, from all the evidence in the case, that that act was committed by the defendant in a state of insanity, they are to discard it from' their consideration altogether. The fact that the defendant was not prosecuted for that act is strong evidence that the act was not deemed to be a crime at the time of its commission. In passing upon the question whether that act was or was not criminal, *71 the jury are to take into consideration the difficulty they may suppose the.defendant to be under in defending himself against it, from the lapse of time since it occurred, the disappearance or dispersion of witnesses, and the like.
Y. In reference to the law of murder, the defense of insanity is an affirmative defense ; and even if the evidence as to the insanity of the defendant should leave it in doubt as to whether he was insane at the time of the commission of the alleged act, if it also leaves in doubt his sanity at that time, he is entitled to an acquittal. Though the evidence may leave the defense of insanity in_doubt, if upon the whole evidence in the case the jury entertain a reasonable doubt as to_the perfect sanity of the defendant at the time of the commission of the alleged act, they are bound to acquit him. _If the jury cannot say beyond a doubt that the defendant was sane at the time of the commission of the alleged act, or cannot say whether at that time he_was sane or insane, they are bound to acquit him."If the jury entertain a reasonable doubt upoñlill theTevidence in the case as to the guilt or innocence of the defendant of the crime alleged "against him, he is entitled to an acquittal (People v. McCann, 16 N. Y., 58; Walters v. People, 32 Id., 164; Ferris v. People, 35 Id., 125). (1.) Lord Hale (1 Hale P. C., 14) two hundred years ago held that the consent of the will was what rendered a man’s action culpable or otherwise, and that no man could commit a crime, although he had understanding, if he had no will. (2.) The same rule is laid down in Blackstone (4 Blacks. Com., 21). (3.) The Divine law recognizes sin as in the mind, not in the act (St. Matt., v., 28). (4.) Hence, if there is any doubt of sanity at the time of the act, the prisoner is entitled to an acquittal.
YI. If, at the time the prisoner committed the act charged upon him (if he did commit it) the deceased suddenly presented himself to him, without any anticipation or expectation on his part that he would then and there see the deceased, and the prisoner was,, from *72 an association of the deceased with his real or fancied domestic troubles, thrown into a state of mini in which lie was deprived of his memory and understanding, so as to be unaware of the nature, character, and consequences of the act he committed, or to be able to discriminate between right and wrong in reference to that particular act at the very time of its commission, he is entitled to acquittal.
VII. If, at the time the prisoner committed the act charged upon him (if he did commit it) the deceased suddenly presented himself to him, without any anticipation or expectation on his part that he would then and there see the deceased,'and the prisoner was, from an association of the deceased with his real or fancied domestic troubles7thrown intolTstate of excitement, in which he was divested of his reason and judgment, and was deprived of his mental power to an extent placing him beyond the range of self-control in reference to the particular act charged against him, so that he could not possibly restrain himself from the commission of the act alleged against him at the very time of its commission, lie is entitled to an acquittal.
VIII. Although sanity is assumed to be the normal state of the human mind, when insanity is once proved to exist, it is presumed to exist until the presumption is overcome by contrary or repelling evidence.
IX. If partial insanity, simply, is shown, as the human mind is not the subject of inspection or examination, and as the range or extent of the disease can only be a matter of scientific conjecture or judgment, the jury have a right to say whether the particular act charged upon the defendant was or was not an amplification or extension or another phase of the disease, even though the testimony may not go that length' (Dean Med. Jur., 574, 575).
X. The jury have the right, from their own knowledge of human nature, and the tendencies of the human mind, in addition to and in confirmation of the evidence *73 of experts, to sav how far the causes relied upon to establish irresponsibility on the part of the defendant, at the time of the commission of his act, were adequate and sufficient to produce insanity, and did cause' that result (Cole's Case, 7 Abb. Pr. N. S., 321).
XT. Where the cause of insanity is alleged to be an in'eiference with a man’s marital relations or his paternal rights, in taking away his wife or child, the jury have the risht to judge of the probability of the existence of such an affection from their own and the known feelings of others as husbands and as fathers. If the jury believe that, at the very time of the commission of the act alleged against him, from causes, operating for a considerable length of time beforehand, or recently or suddenly occurring, the defendant was mentally unconscious of the nature of the act in which he was engaged, he was and is legally irresponsible for it (lb.).
XII. If the defendant was deprived of his reason at the time the act alleged against him was committed, resulting from a settled and well-established mental alienation, or from the pressure and overpowering weight of the circumstances occurring at the time, he is legally irresponsible for what he did (lb.).
XIII. If the jury believe that when the deceased entered the Tribune office, he did not expect to see the defendant, nor the defendant him, and that, after he entered, the defendant was moved to the commission of the act alleged against him by the sudden access and irresistible pressure of excited and overwhelming passion roused by the sudden and unexpected sight of the destroyer of his domestic peace, or him whom he supposed to be such, dethroning his reason, and pressing him on to the commission of this act under the influence of an ungovernable frenzy, unsettling for the time his faculties, and enthroning insanity in their place, he is not responsible for the act (lb.).
XIY. “ If, from the whole evidence, the jury believe that the defendant committed the act, but at the time of doing so was under the influence of a diseased mind, *74 and was really unconscious that he was committing a crime, he is not in law guilty of murder” (United States v. Sickles).
XV. “If the jury believe that for any predisposing cause the defendant’s mind was impaired, and at the time of killing deceased he became or was mentally incapable of governing himself in reference to decease!, and at the time of his committing said actions was by reason of such cause unconscious that he was committing a crime as to the deceased, he is not guilty of any offense whatever” (II).).
XVI. “ If some controlling disease was in truth the' acting power within him (the prisoner), which he could not resist, or if he had not(a sufficient use of his reason to control the passions which prompted the act complained of, he is not responsible” (Kleim's Case, 1 Edm. Sel. Cas., 13).
XVII. “And it must be borne in mind that the moral as well as the intellectual faculties may be so disordered by the disease as to deprive the mind of its controlling and directing power” (II).).
XVIII. “In order, then, to constitute a crime, a man must have memory and intelligence to know that the act he is about to commit is wrong, to remember and understand that if he commits the act he will be subject to punishment, and reason and will to enable him to compare and choose between the supposed advantage or gratification to be obtained by the criminal act, and the immunity from punishment which he will secure by abstaining from it. If, on the other hand, he have not intelligence and capacity enough to have a criminal intent and purpose, and if his moral or intellectual powers are so deficient that he has not sufficient will, conscience, or_ controlling mental power, or if, through' the overwhelming violence of mental disease, his intellectual powers are for the time obliterated, he is not a responsible moral • agent, and is not punishable for criminal acts” (76.).
XIX. If the jury believe from the evidence, that *75 previous to, up to, and at the time of, the- homicide in question, the prisoner thought or believed that his wife and the deceased, or either of them, were or was watching him with a view to ascertaining how he provided for his oldest son, Percy, intending to take legal proceedings to deprive him of that son the first opportunity that offered, and. that he considered his poverty would render him almost helpless against such proceedings, and so he would lose that son ; that this was an unwarranted and unsound delusion on the part of the prisoner ; that thereafter, and in consequence thereof, his mind became and continued diseased ; that such delusion and disease increased in intensity, until the prisoner became, was, and remained subject to great, causeless, and violent frenzies, and paroxysms of rage, in which his power of distinguishing whether he was committing a crime or not, was for the time destroyed or superseded, and that the act charged upon him was committed while in such a paroxysm, and while such power of distinguishing was destroyed or superseded, he is not responsible legally for that act.
XX. If tiie jury believe, from the evidence, that while the prisoner was in such a paroxysm as is described in the last proposition, he committed the act charged upon him, at the time thereof being entirely divested of all mental control over his actions and mental will or conscience, or the capacity to exercise will or conscience^ reference to his conduct, so far as the deceased was concerned," and as against the deceased, he is not responsible, legally, for the act, even though he was at the time capable of distinguishing between right and wrong in reference to his act.
XXI. If the jury believe from the evidence that previous to, up to, and at the time of, the homicide in question, the prisoner thought or believed that his wife actually loved him, and would not have left him but for the persuasion of the deceased and females acting in his interest; that she was willing to return, and would have returned to him but for this cause ; that this was an unwarranted *76 and unsound delusion on the part of the prisoner ; that thereafter, and in consequence thereof, his mind became and continued diseased ; that such delusion and disease increased in intensity until the prisoner became, was, and remained subject to great, causeless, and violent paroxysms of rage, in which his power of distinguishing whether he was committing a crime or not was for the time destroyed or suspended, and that the act charged upon him was committal while in such a paroxysm, and while such power of distinguishing- was destroyed or superseded, he is not responsible, legally, for that act.
XXII. If the jury believe, from the evidence, that while the prisoner was in such a paroxysm as is described in the last proposition, he committed the act charged upon him at the time thereof, being entirely divested of all mental control over his actions, and without will or conscience, or the capacity to exercise will or consc’ence in reference to his conduct, so far as the deceased was concerned,, and as against the deceased, he is not responsible, legally, for the act, even though he was at the time capable of distinguishing between right and wrong in reference to his act.
XXIII. That to make the prisoner responsible for the act charged upon him, the jury must not only be satisfied that he was aware of what he did at the time of doing it, but that he was not morally insane in reference to the deceased, or the act which he is charged with perpetrating upon the deceased.
XXIV. That to make the prisoner responsible for the act charged upon him, he must have been intellectually and morally sane in reference to that act, and the deceased, at the time of its commission.
XXV. ' The law holds no one responsible for his act when the mind was so diseased at the time of the act as to be without reason, conscience, and will, and where, from such causes, the party accused was an involuntary instrument of such a disease, and incapable of refraining from the commission of the act.
*77 XXVI. The accused must have sufficient mental capacity to distinguish "between right and wrong as applied to the acthe is about to commit, and to be conscious that the act is wrong, before he can be convicted of a crime (Roger's Case, 7 Metc., 500).
XXVII. To constitute a crime, the accused must be acted upon by motives, and governed by will (75.).
XXVIII. To convict a person of crime he must have “ memory and intelligence, to know that the act he is about to commit is wrong, to remember and understand that if he commits the act he will be subject to punishment, and reason and will to enable him to compare and choose between the supposed advantage or gratification to be obtained by the criminal act, and the immunity from punishment which he will secure by abstaining from it” (75.).
XXIX. To convict a person of crime “he must have sufficient memory', intelligence, reason and will, to enable him to distinguish between right and wrong in regard to the particular act about to be done, to know and understand that it will be wrong, and that he will deserve punishment by committing it” (75.).
XXX. If the proof shows that the mind of the accused was in a diseased and unsound state, the question will be, whether the disease existed to so high a degree that, for the time being, it overwhelmed the reason, conscience, and judgment; and whether the prisoner, in committing the homicide, acted from an irresistible, uncontrollable impulse; if so, then the act was not the act of a voluntary agent, but the involuntary act of the body, without the concurrence of a mind directing it.
XXXI. Even supposing the defendant to have threatened to kill the deceased, in conversations occurring antecedent to his being shot on November 25, 1869, if the act (the shooting on that day) was perpetrated by the defendant while in a state of insanity, it would still exempt him from legal responsibility.
XXXII. To make the threats evidence' of malice for *78 any purpose, they would have to be uttered while the defendant was in a sane state of mind.
XXXIII. To connect them with the shooting of November 25, 1869, the jury must find that they were uttered maliciously, seriously, with the intent to execute them when, and as they imported, by the defendant in a state of sanity, and that that shooting occurred in pursuance of these threats.
XXXIV. Under any circumstances, the jury must find the threats and act in question were the result of a sane mind. Upon the point of the seriousness of the threats, the jury are to consider the fact that those to whom they were made neither notified the deceased of them, nor took any steps to have the defendant arrested for them, in pursuance of law.
XXXV. If the jury believe that the threats were unmeaning, and were uttered in a state of excitement or anger, without any intention of executing them, and wholly as the result of passion, they are not to b° regarded in determining the character of the homicide in question.
XXXVI. As to the (alleged) shooting of the deceased by the defendant on March 13, 1867, that cannot be taken by the jury as evidence of malice, unless the prosecution have satisfied them by proof beyond all peradventure, that the shooting was felonious.
XXXVII. To do this the proof must be such as would induce the jury to find a verdict against the defendant, if he was on trial under an indictment for that act.
. XXXVIII. If the jury believe, from all the evidence in the case, that that act was committed by the defendant in a state of insanity, they are to discard it from their consideration all together.
XXXIX. The fact that the defendant was not prosecuted for that act, is strong evidence that the act was deemed not to be a crime at the time of its commission.
XL. In passing upon the question of whether that *79 act was or not criminal, the jury are to take into consideration the difficulty they may suppose the defendant to be under in defending himself against it, from the lapse of time since it occurred, the disappearance or dispersion of witnesses, and the like.
XLI. As to the (alleged) shooting of March 13, 1867, it is only evidence against the defendant, on the trial of the present indictment, on the principle that that shooting and that of November 25, 1859, occurred while the defendant was in, a sane state of mind.
XLII. If the jury believe that tlie act of November 25, 1889, occurred while the defendant was in a state of insanity, it is unaffected by the act of March 13, 1869, even though that act was committed in a state of sanity.
XLIII. These propositions are amply sustained by the authorities both in England and in this State. (1.) In England, Hadfield's Case (27 How. St. Tr., 1281); Regina v. Pierce (9 Carr. & P., 667); Oxford's Case (Id., 525), tried in 1840, in which Lord Deumax correctly stated the law of insanity as existing - at that time ; Macnaghten's Case (10 Clark & F., 200; S. C., 1 Townsend's Mod. St. Tr., 321, 324). (2.) In this State there is an express statute (3 Rev. Stat., 5 ed., 983, §'2), which provides that “No act done by a person in a state of insanity can be punished as an offense, and no insane person can be tried, sentenced to any punishment, or punished for any crime or offense, while he continues in that state.” In saying that an aet done in a state of insanity cannot be punished as an offense, the legislature does not mean that the act can be prosecuted to a conviction, and that these proceedings must stop ; they meant that as all criminal proceedings were . designed to land'in'punishment, no’prosecution whatever must result in a conviction when the act was done in á state of insanity. In other words, on a trial the jury must acquit. If the act was not liable to punishment, the accused is not liable to conviction. Insanity being *80 thus established as an absolute bar to a criminal prosecution, by statute which forbids responsibility for a crime or offense committed while in that state, it is immaterial how long the insanity existed before or after the commission of the act; it is enough that it existed at the time of its commission. This principle is consistent with other legal rules. In murder an intent to slay, perfectly formed on the instant, constitutes the crime, under the statutes of this State, as now construed and applied by our courts. Why does not the analogy hold good in reference to irresponsibility for crime ? If a second can make murder, why cannot an instant of time create unaccountability ? The law which says “if a man conceives a, murderous intent on the spot he shall go to the gallows that law should also recognize that if his mind is wiped out on the spot, he at that instant of time becomes irresponsible. If the devil takes possession of a man’s heart, and leads him to commit an act which sends him to the gallows, why, if a visitation of the Deity wipes out his mind, is not that a good reason for recognizing his unaccountability? Now there is another principle in the common law of the land, which is the greatest system of human wisdom ever given out to the world, that common' law does not excuse a man who makes himself drunk to slay"his neighbor ; the law recognizes no right in him to set up his immorality against his criminality ; but if his neighbor maizes him drunk by force or contrivance, and he should commit a crime while in that state of intoxication, the principle would not apply. In the first case it is self-imposed madness ; and in the second, it is a forced or compelled madness. This was well illustrated in Amelia Norman’s case, tried in 1844, where the recorder, in his charge to the jury, made use of this remark, as reported in one of the newspapers of the day, referring to the defense of insanity which had been set up: “That the best rule for the government of the minds of the jury was their own com *81 mon sense view of the casemeaning that that was the correct mode of passing upon the case under the legal instructions received from the court. And in the case of People v. Kleim (1 Edm. Sel. Cas., 13), tried in 1845, the doctrine of Lord Deiosan in Oxford’s case was substantially affirmed, the court holding that in order to constitute a crime a man must have memory and intelligence to know that the act he is about to qommit is wrong, to understand that if he commits the-act he will be subject to punishment; and he must have reason and will to enable him to compare and choose between the suppose:! advantage or gratification to be obtained by the criminal act, and the immunity from punishment which he will secure by abstaining from it. If, on the other hand, he have not capacity enough to have a criminal intent and purpose, and if his moral or intellectual powers are so deficient that he has not sufficient will, conscience, or controlling mental power; or if, through the overwhelming violence of mental disease, his intellectual power is for the time obliterated, he is not a responsible moral agent, and is not punishable for criminal acts. (4.) The same rule was substantially laid down in the case of Rogers «. Commonwealth (7 Metc., 500; S. C., 1 Benn. & H. Lead. Cr. Cas., 94), by Chief Justice Shaw in relation to the same subject. In order, then, to constitute a crime, a man must have memory and intelligence .enough to know that the act he is about to commit is wrong; to remember and understand that if he commits that act he will be subject to punishment; should have reason and will to enable him to compare and choose between the supposed advantage or gratification to be had by the act, and the immunity from punishment which he will secure by abstaining from it. And he must have all those requisites of mind at the time he shoots, if that is the act which is charged upon him. He must be able to remember his relations to his fellow man, and to understand them. He must be able to reason on the con- *82 sequence of Ms doing or not doing a particular act, and. he must have the power of volition, which is the soul and animating principle of all criminal action. Upon any other principle than that, you may hang an insane s.man any day in the week. “If,- on the other hand,” says the same authority,- in effect, “he has not intelligence and capacity to have criminal intent and purpose, and if his reason and mental powers are so deficient that he has no will, no conscience, or controlling mental pow-, er; or if, through mental disease, his intellectual power is for a time obliterated, he - is not a responsible moral agent, and is not punishable for criminal acts.”
XLIY. A careful examination of the authorities will show that the test frequently put, “Whether a man can discern between right and wrong at the time of the act,” is erroneous. The true question is, “Can he obey his judgment V’ (1.) In Freeman’s Case (4 Denio, 9), Judge Beardsley ruled that the insanity must be such as to deprive the party charged with crime of the use of reason in regard to the act done. Partial insanity, where it covers the act done, is fully vindicated by this able jurist, who claims that the party is irresponsible for an insane act. He illustrates this by showing that a man partially deranged does not necessarily commit an insane act, though his act may be beyond the scope of his insanity. He says : “The act, in my judgment, must,be an insane act, and not merely the act of an insane man, to insure his acquittal.” (2.) The court of appeals in People v. Willis (32 N. Y., 715), defined the law thus : “If a prisoner killed a person while in such a state of mind as to know that the deed was morally wrong, he was responsible.” Let it be understood, “morally wrong,” for. upon a proper interpretation of that term depended an important issue in this case. For instance, it is wrong to disobey a corporation ordinance forbidding the putting of ashes on the sidewalk, but there is nothing in the violation of that law to indicate that the man may be insane. But what is that word *83 “ morally wrong ?” To .put such a test to the jury as the ability of a man to be able to distinguish between right and wrong, contrasted with his disobedience of a corporation ordinance, is not the way to test his sanity, He who can distinguish between right and wrong, without being insane, can be convicted. The jury might have said that the prisoner, when he killed the deceased, was in such a state of mind as to know the deed was unlawful. Yet, under certain circumstances, he may be so carried away by ungovernable feelings, such as produced insanityin the mind of-.the prisoner, as to be wholly irresponsible for his actions. (3.) In Wagner v. People (2 Keyes, 684), the court of appeals unanimously held, that the charge of Recorder Hoffman, that if the prisoner committed the act in a moment of frenzy, or if his mind was in that condition, he cannot be convicted of any offense, was right.1 (4.) In Cole's Case (7 Abb. Pr. N. S., 321), Hogbboom, J., held, “If the defendant was deprived of his reason at the time the act alleged against him was committed, resulting either from a settled and well established mental alienation, or from the pressure and overpowering weight of the circumstances occurring at the time, he is legally irresponsible for what he did.”
XLY. Whatever technical rules courts may lay down, jurors will make a distinction in cases of homicide, between those perpetrated in design, and those in anger arising out of. the circumstances of the occasion, when the intention accompanies the act and does not in the common acceptation of the term precede it. It is not strictly true that an intention which arises in a paroxysm of anger and accompanies the blow can be said to have been formed upon deliberation. In other words, the meaning of that sentiment is this: that although judges may charge what they believe to be strict law to the jury, yet they never disapprove,' but always'accept, the practice on the part of the jury to modify” if not to carry out the instructions to the jury (Sickles' Case, pamph.; Mary Harris' Case, pamph.; People v. Lamb, 2 Abb. *84 Pr. N. S., 148; S. C., 2 Keyes, 382; affirming 54 Barb., 342; Maddy's Case, 1 Ventris, 158; S. C., 2 Keble, 829; S. C., as Manning's Case, T. Raymond, 212; Ryan's Case, 2 Wheel Cr. Cas., 47, tried in 1823; Fisher's Case, 8 Carr. & P., 182, tried in 1837; Jarboe's Case, Crawford's Opinions, 18; Brigg's Case, 29 Ga., 723, where the court ruled it was justifiable homicide).
Graham then summed up to the jury, and cited Bunnell v. Greathead, 49 Barb., 106, as showing that civil actions for damages by injured husbands against seducers are not favored: Also Barnes v. Allen, 1 Keyes, 390, as to how far a person is justified in sheltering a wife who has deserted her husband, and 1 Blacks. Com., 447, 453, and 4 Rev. Stat. (5 ed.), 698, § 6, on the subject of paternal rights.
Garvin, summing up for the People, insisted ;—That the rule of law in regard to insanity is, ‘ ‘ That a man is not to be excused from responsibility if he has capacity and reason sufficient to enable him to distinguish between right and wrong as to the particular act he is then doing ; a knowledge and a consciousness that the act he is doing is wrong and criminal, and will subject - him to punishment” (2 Greenleaf on Ev., § 372). Upon the facts of insanity in the case, he referred to Bucknill & Tuke on Insanity, 276; Elwood's Medical Ev., 348; Griffin's Case, 1 Edm., 126; Van Guysling v. Van Kuren, 35 N. Y., 70; Strang's Case, pamph.
He. insisted that the retaining of private counsel was sanctioned by the precedent adopted in the cases of' Monroe Edwards, Friery, Rogers, and Huntington.
His honor, the Recorder, charged the Jury as follows:
Gentlemen of the Jury:—It must be an especial cause of congratulation to you and to all others who have assisted in this trial, that it rapidly draws to a close. The sworn deliberation and solemn conclusion which your duty as jurors enjoins upon you, is all which remains unfulfilled.-
*85 In a few hours this case, which has daily been prominently presented during five weeks to the public eye, will pass quietly from its gaze, to be remembered only for the precedent which your verdict may establish.
You could but have noticed, from the ea^er throng daily besieging the court room, that this has been a trial invested with great public interest; which, properly may be attributed to the fact, that incidentally as well as directly, have been brought forward many notable personages, whose public positions, acts and sayings, in conjunction with the wife of the accused, during several years prior to the shooting, have occasioned extraordinary and diffuse comments.
I ask your undivided attention while I assist you in holding evenly the balance beam from which depend the scales of acquittal or conviction, in which so large a volume of evidence has been placed.
The duty of judge and jury is always difficult, at the end of cases in which unavoidable latitude has been given to evidence, or taken by the zeal of counsel, or consumed in eloquent addresses upon either side.
Your duty becomes extraordinarily difficult under the extreme latitude taken by evidence and counsel during this trial, and, to some extent, proceeding from the peculiarities of the defense, or absence of objections. I can best liken your labor to that of the gold miner who is obliged to sift bushels of sand in order to obtain a few grains of gold ; because amid all these accumulations of evidence the issues for you to determine are really few, and capable of being simplified. If it had been possible at the outset to know what circumstances were admissible in evidence, as directly bearing upon the insanity defense, this case might perhaps have been closed, within a week.
This accused is not to be either convicted or acquitted upon the speeches of counsel, nor acquitted upon sympathy for him or his child, nor convicted upon prejudice toward the dead or the living, nor convicted because *86 public policy may demand example. I feel it my duty to remind you also .that no persons beyond the accused are on trial, except in so far as they have been material witnesses, and then only their credibility as witnesses on the trial is to be considered by you.
I know that man is so constituted by the intimate relation between his intellectual and affective or emotional qualities, that it is difficult for him in any condition of life to keep sympathy or prejudice from -warping judgment. But the juror must closely self-catechise, in order to discover,, if he can, whether either prejudice or sympathy exist in Lis mind. If either has impressed' him*, whether from remarks of counsel, of judge, or from his own creations, such sympathy or prejudice must be sternly laid aside.
Sympathy is just as much to be dismissed as prejudice, and prejudice as much as sympathy. Only that you might, if possible, probe the mind of the accused, and find out what manner of man he was, and how certain untoward circumstances were likely to impress that; mind maliciously or excusably, has there been admitted; testimony of a character which, when disconnected from! the foregoing inquiry, "becomes wholly irrelevant.
I deem it my duty to more particularly caution you against favorably or unfavorably mixing up the evidence with remarks from counsel upon either side. At the close of a long criminal trial it is difficult even for a judge, and sometimes for lawyers engaged in the case, to remember whether an impression toward an accused! was derived from actual evidence, or from the remarks! of counsel upon that evidence, or from remarks without evidence.
I deem it also my duty to particularly caution you against prejudice or sympathy growing out of acts or speeches of counsel upon either side. That one counsel has left either side of the case, or that extra counsel came to aid the prosecution, has nothing to do with your estimation of the facts. Additional counsel for the *87 people cannot ever come into a criminal case without assent of the court. Says Bishop on Criminal Procedure, vol. 1, sec. 998: “A prosecuting officer while conducting the cause may, with the concurrence of the court, be assisted by other legal persons.”
To criticise, therefore, the employment of extra counsel, is to criticise the action of the court. Let me, however, remark that the motive or spirit with which either prosecution or defense has been conducted is legitimate subject for criticism, subject to the rules of candor and taste:
In United States v. Hanway (2 Wall. Jr., 139), the court approved of counsel coming by order of the governor as counsel, when employed by the friends of the deceased person.
Bishop, in the section quoted, says: “The question of help may depend somewhat'upon local usage.” The records'of this court show that there has seldom been an important trial in homicide cases within it, without additional counsel for the people. • Some of the very cases cited by the counsel for the defense show that counsel, other than the district-attorney and attorney-general, represented the people. In Great Britain, to this day, nearly all prosecutions for the crown are conducted by counsel employed by private prosecutors.
-The zeal of the counsel for the defense has been criticised by the district-attorney. I deem it it to be my _ duty to repeat to you the extreme rule governing the duty of a counsel, as laid down by<Mr. Henry Brougham in his speech for Queen Caroline. As he afterward became lord chancellor, and lived, I believe, for ninety years, and as the extract appears in his published works, it maybe presumed to remain.at least of the same value it possessed when stated. I do not say whether I approve or disapprove of it—I state it as the extreme view, and' one which any counsel for defense might adopt with conscientious belief in it. “ An advocate in discharge of his duty knows but one person in all the world, and that person is his client. To save that *88 client by all means and expedients, and at all hazards and costs to other persons, and among them to himself, is his first and only duty, and in performing this duty he must not regard the alarm, the torments, the destruction which he may bring upon others. Separating the duty of a patriot from that of an advocate, he must go on, reckless of consequences, though it should be his unhappy fate to involve his country in confusion.”
But judge and jury, at all events, must discriminate only the evidence, amid zealous meañs and zealous expedients, whenever those exist in any case. Judge and jury must further discriminate between the real issue and those dis‘racting issues which may have been dragged into a ca_se, and/(in the language of Mr. Brougham) have invited “ hazards and costs' to other persons,” or included “ torments brought upon them.”
Dismiss utterly from your minds any references to or impressions about persons who have not been witnesses. Heed no criticism even of witnesses, unless you find it authorized by something directly-in the evidence. Conscientiously reject from your memory every fact or circumstance in evidence- which, in your estimation, cannot illustrate the question of sanity, insanity, or malice, and which does not bear upon the time, place, mode, and act of killing.
Let us begin with the first day.
While some of you, perhaps most of you, sat in court as individuals, and not yet jurors, Daniel McFarland was arraigned at thislbar. The indictment, stripped of its technical verbiage, charged that he killed Albert D. Richardson, intending to kill him.
Included in the direct charge was an implied one t-liat belongs to all cases of crime—that the intention was of a man in a state of sanity.
I shall, for brevity, use the phrase “state of sanity or state of insanity” continuously through this charge. I do sobecause it is the statutory phrase—“No act done *89 by a person in a state of insanity can be punished as an offense.”
The statute did not, and no arbitrary statute could, give a definition of insanity which should include all cases. Hence it is left to be interpreted by the courts. In using the phrase, “state of sanity,” I am to be understood throughout as meaning thereby this, the state in which a man knows the act he is committing to be unlawful and morally wrong, and has reason sufficient to apply such knowledge and to be controlled by it.
In using the phrase, “state of insanity,” I am to be understood throughout as meaning thereby, the state •underjwhich a man is not accountable' for an alleged criminal act, because he does not know the act he ■is committing to be unlawful and morally wrong, and has not reason sufficient to apply such knowledge and to be controlled by it.
The accused simply pleaded not guilty to the charge. That general denial (as subsequent testimony has shown you) was really a particular denial—a denial that he killed with intention to kill, because he was not legally capable of forming an intention to kill, as an intention which was recognized by the law to be criminal, and thereby to render him accountable to human law.
Practically, by the evidence, the physical act of , killing (that is so often a subject of dispute in homicide cases) has been admitted. But the mental character of the act, the legal accountability for the act, were put in issue.
After the arraignment you were then severally called and sworn. Whatever was said or done during the progress of challenging or impanneling, is to be disregarded or forgotten by you as in any way bearing upon the present relations between you and the prisoner. For ’ instance, the circumstances that the defense or the prosecution excluded jurors, are not in the remotest manner in the case. Each side had that statutory right to *90 exclude. A right given and exercised under statute is never amenable to criticism. That procéss of challenging andlmpanneling was simply upon the relation of each of you, as a juror, in the then future, toward either the people or the prisoner. When you were sworn, both the people and the_prisoner stood practically contented to have you hear evidence, and all which accompanied the impanneling of the twelve is now as if it never had been said' or done.
The evidence..began, and it has closed.
Your inquiries in considering the whole evidence will' naturally be,
.Mrsi-^What are the theories of each side ?
Second.—What are the rules of law that connect themselves with those theories ?
The theory up on which the defense seek acquittal is,, substantially, ■ that domestic troubles produced in the accused a state of insanity toward Mr. Richardson.
The theory upon which the prosecution seek conviction is, that the domestic troubles originated and fostered such a spirit in'the accused toward Mr. Richardson as the law calls and rebukes as malice.
"Reviewing the evidence upon the subject of the state of insanity offered by the defense, I can see that nearly all of it would have*been admissible had it been offered by the prosecution to prove malice.'
The defense justify the accused in domestically acting as he did toward his wife and her friends..
The prosecution take some issue on that justification.
The defense claim that a conspiracy to disturb the domestic relations of the accused existed on the part of. some of the wife’s friends.
But, gentlemen, retain constantly in your minds! that the actual state of these domestic relations, or ^ the blame or praise appertaining to them, or the fact, • or color of fact, or the falsity, of any such conspi *91 racy, are not at all material for you to definitely adjudicate.
The question for your consideration (whether you estimate insanity or malice) is, how did the prisoner believe about those domestic relations or a conspiracy, as a belief to impress his mind, sanely or insanely ?
The law books are full of cases of sane men who have killed from'a malice engendered zby utterly'"false conceptions of occurrences or individuals. Medical records and law books contain many-instances of insane men killing under an insanity which was the result of the most delusive or unsubstantial or’ irrational conception of human conduct or material events, as well as of men killing from insanity occasioned by the operation of actual facts.
The theory of the defense as to the operation of the domestic troubles upon the mind of the accused, was undoubtedly fully presented by "the long question put by the counsel for the defense to Drs. Vance and Hammond, and which you can' doubtless substantially recall.
The theory of the prosecution mainly as to the malice and' partially as to the sanity, was quite substantially presented by the compact question put to the same witness on the cross-examination, and which you may recall.
I do not intend to comment upon the evidence. I do not think I ought to. In the first place, it has been summed up in parts by the speeches on either side" during evidence, and as a whole in the-closing arguments. In the next place, it is impossible for me to take up the evidence without possibly impressing upon you by my arrangement of it, or emphasis in repeating it, the very decided conviction upon the merits, of this prosecution! which I have formed. I shall simply group it as appertaining to the question of malice or insanity, or to other legal questions, and leave the details to your memory.
*92 The legal necessity for a man-slayer to have been in a state of sanity when he slew, before he can be held accountable to human law, :is deeply rooted in jurisprudence.
As far back as the civilians, the maxim was “ Furiosus furioso sólum puniturF A madman’s madness is his only punishment.
In the early history of the common law, one of the essentials to the definition of murder (a definition which is its universal test in jurisprudence), was “ sound memory and discretion.” “Murder is where a person of sound memory and discretion unlawfully kills any reasonable creature, being in the peace of the king, with malice prepense or aforethought, either express or implied.”
The converse phrase of our statute, “ state of insanity,” is convertible with that_other phrase, “sound memory and discretion,” in the common law. As early as 1816, in this court (see 1 City Hall Rec., 176), it was said: “An insane person is considered, in law, inca-' pable of committing a crime; but it is not every degree of "insanity which abridges the responsibility attached to the commission of crime. In that species of insanity, where the prisoner has lucid intervals; if, during those intervals, and when capable of distinguishing good from evil, he perpetrates an offense, he is responsible ;. and the principal subject of inquiry is, whether the prisoner, at the time he committed the offense, had sufficient capacity to discern good from evil; and should the jury believe he had such capacity, it will be .their duty to find him guilty.”
The utter irresponsibility to human law of the madman (or the man who lacks a sound memory or discretion, and) who takes human life, has never been doubted. The difficulty has been to decide upon the degree of the madness, or the quality of the insanity which shall claim irresponsibility. It may be interesting to the legal student to follow the discussions of *93 legal tribunals upon this subject, and, indeed, to mark their fluctuations of doctrine. But the law, regulating to-day the inquiry of a jury upon the subject, is not complex. If you will ke.ep in mind what I have held to be the meaning of the phrases, “ state of sanity,” or “insanity,” in the statute, I will now refer to the propositions of "the counsel for the defense upon that subject. •
I substantially charge every proposition of the counsel for the ^defense upon the subject of sanity. There is possibly no difference of legal opinion between the counsel for defense and the district-attorney regarding the law constituting state of sanity or insanity. The difference between them is one of applicability of the legal rule to the particular circumstances of the case. Those differences have been reasoned out or commented upon in the summing-up, but it is due to the counsel for the defense that I should re-read them, with my comments.
“Even if the evidence as to the insanity of the defendant should leave it in doubt as to whether he was insane at the time of the commission of the alleged act, if it also leaves in doubt his sanity at that time, he is entitled to an acquittal.”
Which I charge.
“Though the evidence may leave the defense of insanity in doubt, if, upon the whole evidence in the case, the jury entertain a reasonable doubt as to the perfect sanity of the defendant'at the time of the commission of the alleged act, they are bound to acquit him.”
Which I charge.
“If the jury cannot say beyond a doubt that the defendant was sane at the time of the commission of the alleged act, or cannot say whether at that time he was sane or insane, they are bound to acquit him.”
Which I charge.
“ If the jury entertain a reasonable doubt upon all the evidence in the case, as to the guilt or innocence of *94 the defendant of the crime alleged, against him, he is entitled to an acquittal.”
. Which I charge.
“If, at the time the prisoner committed the act charged upon him (if he did commit it), the deceased suddenly presented himself to him, without any anticipation or expectation on his part that he would then and there see the deceased, and the prisoner was, from an association of the deceased with his real or fancied domestic troubles, thrown into a state of mind in which he was deprived of his memory and understanding, so as to be unaware of the nature, character, and consequences of the act he committed, or to be unable to dis- • criminate between right and wrong-in reference to that particular act, at the very time of its commission, he is entitled to an acquittal.”
Denied, for the reason that there is no evidence upon the subject of sudden or expected presentation to justify . the hypothesis.
“If, at the time the prisoner committed the act charged upon him (if he did commit it), the deceas d suddenly presented himself to him without any anticipation or expectation on his part that , he would then and there see the deceased, and the prisoner was, from an association' of ther deceased with his real or fancied domestic troubles, thrown into a state of excitement in which he was divested of his reason and judgment, and was deprived of his mental power to an extent placing him beyond the range of self-control in reference to the particular act charged against him, so that he could not possibly restrain himself from the commission of the-act alleged against him, at the very time of its commission, he is entitled to an acquittal.”
Denied, for like reason.
“Although sanity is assumed to be the normal *state of the human mind, when insanity is once proved to exist, it is presumed, to exist until the presumption is overcome by contrary or repelling evidence.”
Refused for the reason that the insanity for your inquiry relates exclusively to the time of the act.
“ If partial insanity, simply, is shown, as the human *95 •mind is not the subject of inspection or examination, and as the range or extent of the disease can only be a matter of'scientific conjecture or judgment; the jurv have a right to say whether the particular act charged upon the defendant was or was not an amplification, or extension, or another phase of the disease, even though the testimony may not go that length.”
Refused.
“The jury have the right, from their own knowledge of human nature,'-'and the tendencies of the human mind, in addition to, and in confirmation of, the evidence of'experts, to say how far the causes relied upon to establish irresponsibility on the part of the defendant at the time of the commission of his act were adequate or sufficient to produce insanity, and did cause that result.” ,
Which I charge you.
“Where the cause of insanity is alleged to be an interference with a man’s marital relations, or his paternal rights in taking away his wife or child, the jury have the right to judge of the probability of the existence of sucll an affection from their own and the known feelings of others, as husbands and as fathers.”
Refused.
“If the jury believe that, at the very time of the " commission of the act alleged against him, from causes operating for a considerable length of time beforehand, or recently, or suddenly occurring, the defendant was mentally unconscious of the nature of the act in which he was engaged, he was and is legally irresponsible for it.”
Which I charge.
“If the defendant was deprived of his reason at the time the act alleged against him was committed, resulting either from a settled and well-established mental alienation, or from the pressure and overpowering weight of the circumstances occurring at the time, he is legally irresponsible tor what he did.”
Which I charge.
“If the jury believe.that when the deceased entered *96 the Tribune office lie did not exnect to see the defendant, nor the defendant him, and that, after he entered, the defendant was moved to the commission of the act alleged against him by the sudden ac -ess and irresistible-pressure of excited and overwhelming rassion, roused by the sudden and unexpected sight of the destroyer of his domestic peace, or him whom he supposed to be such, dethroning his reason and pressing him on to the commission of this act under the influence of an ungovernable frenzy, unsettling for the time his faculties and enthroning insanity in their place, he is not responsible for the act.”
Refused, because not wholly justified by evidence.
“If from the whole evidence the jury believe that the defendant committed the act,-but at the time of doing so was under the influence of a diseased mind, and was really unconscious that he was committing a crime, he is not in law guilty of murder.”
Which I charge.
“If the jury believe that from any predisposing cause the defendant’s mind was impaired, and at the time of killing deceased, he became or was mentally incapable of governing himself in reference to deceased, and at the time of his committing said act was, by reason of such cause, unconscious tuat he was committing a crime as to the deceased, he is not guilty of any offense whatever.”
Which I charge.
“If some controlling disease was in truth the acting power within him (the prisoner) which he could not resist, or if he had not a sufficient use of his reason to control the passions which prompted the act complained of, he is not responsible.”
Which I charge..
• “And it must be borne in mind that the moral, as well as the intellectual faculties, may be so disordered by disease as to deprive the mind of its controlling and directing power.”
Which I charge.
“In order, then, to constitute a crime, a man,must *97 have memory and intelligence to know that the act he is ahont to commit is wrong ; to remember and. understand that if he commits the act he will "be subject to punishment,: and reason and will to enable him to compare and choose between the supposed advantage or gratification to be obtained by the criminal act, and the immunity from punishment which he will secure by abstaining from it. If. on the other hand, he have not intelligence and capacity enough, to have a criminal intnt and purpose, and if his moral or intellectual rowers are so deficient that he has not sufficient will, conscience, or controlling mental power, or if, through the overwhelming violence of mental!disease, his intellectual power is for the time obliterated, he is not a responsible moral agent, and is not punishable for criminal acts.”
Which I charge.
“ If the jury believe from the evidence that previous, up to, and at the time of the homicide in question, the prisoner thought or believed that his wife and the deceased, or either of them, were or was watching him with a view to as ertaining how he provided for his oldest son Percy, intending to take legal proceedings to deprive him of that son the first opportunity that offered, and that he considered his poverty would render him; almost helpless against such proceedings, and so hei would lose that son; that this was an unwarranted and-unsound delusion on the part of the prisoner; that thereafter, and in consequence thereof his mind became ■ and continued diseased; that such delusion and disease increased in intensity until the prisoner became, was, and remained subject to great causeless and violent frenzies and paroxysms of rage, in which his power of distinguishing whether he was committing a crime or not, was for the time destroyed or superseded, and that, the act charged upon him was committed while in such a paroxysm, and while such power of distinguishing was destroyed "or superseded, he is not responsible legally for that act.”
Refused, because, although good in part, it is not, in my opinion, correct as an entire proposition.
“If the jury believe, from the evidence, that while the prisoner was in such a paroxysm as is described in the last proposition, he committed, the act charged-upon *98 him, at the time thereof "being entirely rlivpsted of all mental control over his actions, and with nut will ur conscience, or the capacity to exercise will or conscience in reference to his comiuofy so far as the deceased was con-, cerned and as against the deceased, he is not r snonsihle legally for the act, even though he was, at the time, capable of distinguishing between right and wrong in reference to his act.”
Which I charge.
“If the jury believe from the evidence that previous, up to, and at the time of the homicide in question, the prisoner thought or believed that his wife actually loved him, and would not have left him but for the persuasion of the deceased and females acting in his inter- ■ es1-, and that she was willing to return and would have returned to him but for this cause, tliat this was an unwairanted and unsound delusion on the part of the prisoner, that thereafter, and in consequence thereof, ■ his mind became and continued diseased, that such delusion and disease increased in intensity until the prisoner became, was, and remained subject to great causeless and violent frenzies and paroxysms of rage, in which his power of distinguishing whether he was committing a crime or not was, for the time, destroyed or superseded, and that the act charged upon him was committed while in such a paroxysm, and while such power of distinguishing was destroyed or superseded, he is not responsible, legally, for that act.
Refused, because, although good in part, it is not, in my opinion, correct as an entire proposition.
“If the jury believe, from the evidence, that while the prisoner was in such a paroxysm as is described in the last proposition, he committed the act charged upon him, at the time thereof being entirely divested of all mental control over his actions, and without will or' conscience, or the" capacity to exercise will or conscience in reference to his c mduct, so far as the de-' ceased was concerned, and as against the deceased, he is not responsible legally for the act, even though he was, at th3 time, capable of distinguishing between right and wrong in reference to his act.”
Which I decline to charge in the terms proposed.
*99 “ That to make the prisoner responsible for the act charged upon him, the jury must not only be satisfied that he was aware of wliat he did, at the time of doing it, but that he was not morally insane in reference to the deceased, or the act which he is charged with perpetrating upon the deceased.”
- Which I charge.
“ That to make the prisoner responsible for' the act charged upon him, he must have been intellectually and morally sane in reference to that act and the deceased at the time of its commission.” •
Which I charge.
“That the law holds no one responsible for his act, where his mind was so diseased at the time of the act as to be without reason, conscience, and will, and 'where from such causes the party accused was an involuntary instrument of such a disease, and incapable of refraining from the commission of the act.”
Which I charge.
“The accused must have sufficient mental capacity to distinguish between right and wrong, as applied to the act he is about to commit, and be conscious that the act is wrong, before he can be convicted of a crime.”
' Which I charge.
“To constitute a crime, the accused must be acted upon by motives, and governed by witt.”
Which I charge.
“ To convict a person of crime, he 1 must have memory and intelligence to know that the act he is about to commit is wrong, to remember and understand, that if' he commits the act he will be subject to punishment, and reason and will to enable him to compare and choose between the supposed advantage or gratification to be obtained by the criminal act, and the immunity from punishment which- he will secure by abstaining from it.5 55 ..
Which I charge.
“ To convict a person of crime, ‘ he must have sufficient memory, intelligence, reason and will to enable. *100 him to distinguish between right and wrong in regard to the particular act about to be done, to know and understand that it will be wrone-, and that he will deserve punishment by committing.’ ”
Which I charge.
“If the proof shows that the mind of the accused was in a diseased and unsound state, the question will be whether the disease existed to so high a degree that, for the time being, it overwhelmed the reason, conscience, and judgment; and whether the prisoner, in committing the homicide, acted from an irresistible and uncontrollable impulse ; if so, then the act was not the act of a voluntary agent, but the involuntary act of the body, without the concurrence of a mind directing it.”
Which I charge.
But in regard to all the matters embraced in the foregoing propositions to charge, it is proper to add that they are really rhetorical amplifications more or less (according to different phases of theory or evidence) of the rule of laAv which I have laid down for interpreting the phrases of the statute, “ state of sanity,” or “insanity.”
This case differs somewhat from all those cited, in one respect. Here the accused had grown familiar with the wrongs that he alleges to have been done to his marital relations by the deceased. Tears progress from his first alleged discovery of the alleged wrongs. The defense claim that this very lapse of time engendered morbid fancies, and was likely to grow into settled insanity, or to beget a state of mind easily influenced to frenzy. The prosecution claim that this familiarity with alleged wrongs, and, indeed, acquiescence in them, and to some extent trafficking upon them, begot only the malice of the law of murder, and utterly destroy the idea of insanity. I think all the cases' cited are of nisi prius acquittals, under circumstances of frenzy induced flagrante delicto, or by recent communication of dishonor, or of sudden wrongs calcu *101 lated to dethrone reason. The only case of conviction in the courts of this State, under analogous circumstances, which has reached very authoritative discussion, as I have been able to find, is the Sanchez case.
The court of appeals in the case of Sanchez (22 N. Y., 147), thus says : “Assuming the theory of the defense to-have been, as the prisoner’s counsel alleges,! that the homicide was committed by the prisoner in an insane frenzy, superinduced by jealousy awakened in his mind in relation to his wife’s conjugal infidelity— which would reduce the offense from murder to manslaughter—and that such theory was a sound one, the inquiry should have been confined to the time and occasion of the homicide, or within a period, so shortly before, that the court could see that the passions had not, or might not have had time to subside. The questions to each of these witnesses related to an indefinite period of time between the prisoner’s marriage and the homicide ; and, therefore, if for no other' reason, were clearly inadmissible.”
Which leads me to say that (as was in the minds of the jury in the Cole case, according to their verdict) the state of insanity, and the act of commission, must concur in direct point of time. This is the converse of the well-settled rule in cases of sane persons committing murder—that the design to kill may be conceived on the, instant of killing. In Cole’s case the jury said:
“We find the prisoner to have been sane at the moment before and the moment after the killing, but are in doubt as to his sanity at the instant of the homicide.” The doubt was given to the prisoner, because on that instant hinged the issue.
You might conversely arrive at the conclusion that the deceased may have been in a state of insanity at1 periods prior to the moment of killing, or was in a state of insanity shortly afterward, and you might find him in a state of sanity at the moment of the shot—exercising perception to recognize the deceased, exercising *102 memory in recalling wrongs, exercising will in aiming the pistol, and exercising judgment in going away—all of which are questions for you to determine.
If you shall arrive at the conclusion that the accused was in a state of sane mind at the time he fired the shot, then it becomes important to consider the legal quality of the act.
If you believe, from the evidence, that the accused armed himself with a loaded pistol, and sought out the deceased and shot him upon grudge or malice, intending to kill, he is guilty of murder in the first degree.
If, having a loaded pistol, he shot deceased without intent or design to take life, and-in the heat of passion, then it may be either manslaughter in the third or fourth degree. Technically described by the statute, murder, first degree, is the killing of a human being, when not justifiable or excusable, nor coming under the head of manslaughter, and perpetrated with a premeditated design to effect death.
I am requested by the counsel for the defense to charge certain propositions, respecting the first shooting. This first shooting is regarded by the prosecution as evidence of malice, or grudge, 'or ill-will, and of their manifestation by accused toward deceased, and it is an important circumstance for you to weigh.
i “As to the (alleged) shooting of the deceased by the defendant on March 13, 1867, that cannot be taken by the jury as evidence of malice, unless the prosecution have satisfied them by proof beyond all reasonable doubt, that the shooting was felonious.”
Which I charge.
“To do this, the proof must be such as would induce the jury to find a verdict against the defendant, if he was on trial under an indictment for that act.”
Which I charge.
“If the jury .believe, from all the evidence in the case, that that act was committed by the defendant in *103 a state of insnnity. thev are to discard it from tlieir consideration altogether.”
Which I charge.
“The fact that the defendant was not prosecuted for that act, is strong evidence that the act was not deemed to be a crime at the time of its commission.”
Which I decline to charge.
“To make the threats evidence of malice for any rurpos°, they would have to be uttered while the defendant was in a sane state of mind.”
Which I charge.
“To connect them with the shooting of November 25,1839, the jury must find that they were uttered maliciously—seriously—with the intent to execute them when and as they imported, by the defendant in a state of sanity, and that that shooting occurred in pursuance of these threats.”
Which I decline to charge.
“ In passing upon the question of whether that act was or not criminal, the jury are to take into consideration the difficulty they may suppose the defendant to be under in defending himself against it, from the lapse of time since it occurred, the disappearance or dispersion of witnesses, and the like.”
Which I decline to charge.
“As to the (alleged) shooting of March 13, 1867, it is only evidence against the defendant on the present indictment, on the principle that that shooting and that of November 25,1869, occurred while the defendant was in a sane state of mind.”
Which I charge.
“ If ithe jury believe that the act of November 25, 1869, occurred while the defendant was in a state of insanity, it is unaffected by the act of March 13, 1867, even though that act was committed in a state of sanity.”
Which I charge.
“Even supposing the defendant to have threatened to kill the deceased, in conversations occurring antecedent to his being shot on November 25, 1869—if that *104 act (the shooting on that day) was perpetrated "by the defendant while in a state of insanity, it would still exempt him from legal responsibility.”
Which I charge.
“Under any circumstances the jury must find that the threats and act in question were the result of a sane mind.”
Which I charge.
“Upon the point of the seriousness of the threats, the jury are to consider the fact that those to whom they were made neither notified the deceased of them, nor took any steps to have the defendant arrested for them, in pursuance of law.”
Which I decline to charge.
“If the jury believe that the-threats were unmeaning, and were uttered in a state of excitement or auger, without any intention of executing them, and wholly as the result of passion, they are not to be regarded in determining- the character of the homicide in question.”
This would only modify their weight in evidence, but would not exclude them from the jury.
Experts have been called in this case. They are to be considered rather as mirrors with which merely to reflect upon you their opinions. But you remain the sole judges whether those reflections are accurate. Sometimes the expert is an enthusiast; sometimes he is a clever charlatan. In the one case even his good judgment may be warped, in the other his want of judgment may be speciously hidden. Hence the usefulness of the jury as umpire.
The exact line between sanity^and insanity in medical philosophy or medical jurisprudence, is as intangible and as difficult to precisely measure as a meridian line in geography. But laiw and science in each instance do the best they can to arbitrarily fix them for safety. Experts in mental or moral philosophy, as in geography, can only describe and illustrate. You become the judges. Test for yourselves, from this evidence, the phases and conditions of sanity or insanity, or the line between aversion, anger, rage, hatred, wrath, *105 vengeance on one side, and the dethronement of reason upon the other.
We have all probably seen manifestations of the emotions and passions just named. A great philosopher has said, “No man is sane.” “ That in every organization there is more or less of a deviation from the normal condition of the mind as the Deity would have it.” Anger itself is a short-lived madness ; wrath is longer-lived. Vengeance is still longer-lived; but neither anger, nor wrath, nor vengeance, unless producing a state of insanity, wholly excuses crime. Hence, as philosophers, experts, jurors, judges, counsel, and laymen might speculate wildly and blindly regarding the measure of the insanity that will excuse an otherwise criminal act, the law has come to define it as well as it can and leave the application in particular cases to the sworn judgment of jurors—the real experts—and upon all the testimony.
I -will here read from Wharton & Stille's Medical Jurisprudence, § 115:—“Bbiawd says, that from the height of passion to madness is but one step, but it is precisely this step which impresses upon the act committed a distinct character. It is important to know exactly the precise characteristics of the passions and of insanity. But here science fails, for it must be admitted that we are unable to point out the place where passion ends or madness commences. M. Oefila draws the following distinction between a man acting under'the impulse of the passions and one urged on by insanity: 6 The mind is always greatly troubled when it is agitated by anger, tormented by an unfortunate love, bewildered by jealousy, overcome by despair, humbled by terror, or corrupted by an unconquerable desire for vengeance, &c. Then, as is commonly said, a man is no longer master of himself, his reason is affected, his ideas are in disorder, he is like a madman. But in all these cases a man does not lose his knowledge of the real relation of things ; he may exaggerate his misfortunes, but this misfortune is real, and if it carries *106 him ^to commit a criminal act, this act is perfectly well motived. Insanity is more or less independent of the cause that produced it; it exists of itself-; the passions cease with their cause, jealousy disappears with the object that provoked it, anger lasts but a few moments in the absence of the one who, by a grievous injury, gave it birth,- &o. Violent passions cloud the judgment, but they do not' produce those illusions which are observable in insanity.’ ”
The counsel for the defense has stated in your hearing that several times, in kindred cases, he has been called upon to vindicate the sanctity of the marriage tie, or uphold and defend the marriage relation.
■ I charge you, gentlemen, that no such ideas should find entrance into the jury box. You are not to uphold nor to prostrate the marriage relation by your verdict.
Fourierism, free love, or sentimentalism on the one hand, and moral reflections upon the conduct of the deceased man or living woman upon the other hand, are not legitimately to affect your verdict. Some of you might arrive at the conclusion upon some of the extraneous matters that have been foisted into this case, that Richardson was the demon whom counsel for the defense describe him to have been, and others of you might arrive at a conclusion that the fact of Richardson and Mrs. McFarland both desiring a divorce and a marriage was proof that no criminality existed between them down to the time of the homicide.
Yet, either conclusion would be foreign to your duty—your sworn and solemn duty—your duty to the public, and respect for due course of law and order, as well as your duty to the accused. ■
Unsworn men, not clothed with , the solemnity of jurors’ oaths, and interpreting a worldly code, may say' that he who seduces the wife of another ought to be killed, or that he who does so upholds the marriage relation. But judges and jurors must interpret the strict, legal code—a code that to swerve even a hair’s breadth from is often as fatal to human -society as the slightest *107 variation of the mariner’s compass is sometimes fatal to the ship and her passengers, whose safety depends on the unswerving integrity of the magnetic needle. And in interpreting that code the inflexible rule of jurors should be that the aggrieved husband, or father, or relative, who takes the correction of wrongs into his own hands with pistol or knife, and is not in a state of insanity when he did the correction, is not to be acquitted because it is the duty of any man to uphold the sanctity of the marriage tie, unassisted by legal procedure.
When the prisoner brought his suit against Richardson he was within law. When he became executioner he took the law into his own hands. If he took this law into his own hands in a state of sanity and with malice, however much sentiment for the living prisoner may applaud the act, he is guilty of felonious killing. If in a state of insanity, however much sentiment in favor of the dead might reprehend the act, or however much all persons might reprehend the wrong done the State by killing its citizen in an unauthorized mode, the accused is not guilty.
The idea of strictly maintaining the law is that jurors shall not speculate upon provocation. Wrongs occasioned by a swindler, by a betrayal of political friendship, or by the numerous variety of social insults could be just as logically estimated outside of law by jurors in other cases, as the wrongs occasioned by a seducer. All wrongs may extenuate homicide from the degree of murder to one of manslaughter, when the violent vindicator of them is in a state of sanity, but under a. passion which does not permit a design to take life. Laws against homicide are enacted and enforced because society is full of wrongs and of temptations thereby to commit violence at the instigations of malice or pas-j sion. Under any wrongs, the sane person whom' they may have impressed is not at liberty, after his'passions have had time to cool, and after the tempest of excited feeling has subsided, to stalk abroad, seek out the un • conscious and unprepared victim of his resentment, *108 and, without the intervention of forms of law or the judgment of his peers, become the self-appointed avenger of his own wrongs, or vindicator of the violated majesty of the law.
The law must be left to maintain its own dignity, and to enforce its own decrees through the constituted tribunals of its own creation, and it has not, in any just or legal sense, commissioned the accused to the discharge of the duties of the high office of the law. •
We must carry into effect the law of the land; we must enforce its solemn mandates, and not nullify or relax its positive commands by misplaced sympathy or morbid clemencjr. If our duty is clear, we forswear ourselves if we do not perform it.
This duty we must discharge at whatever hazard, whether painful or disagreeable. Neither manhood or honor, the restraints of conscience, nor the solemn mandates of the law, allow us to decline its performance, or to hesitate at its execution.
Let ns content ourselves with administering the law as we find it in our own appointed sphere of duty. Then we shall have consciences void of offense toward all men, and the happy consciousness that in the spirit of our oaths, and in conformity with the obligations which rest upon us, we have, as faithful and law'-abiding citizens, executed the laws of-the land.
Mr. Graham. I want your honor to charge this sentence of Recorder Hoffman’s charge in the Wagner case:
“I liave been requested,” says Recorder Hoffman, “to charge you, that if the prisoner committed the act in a moment of frenzy, he cannot be convicted of murder in the first degree. I not only charge that proposition, but if his mind was in that condition he cannot be convicted of any offense.” '
The Court. I so charge.
The jury retired, and in an hour and forty-eight minutes,returned, and rendered a verdict of “Not Gruilty,” and the prisoner was discharged.